UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RODNEY BARNETT and HEATHER WOLFF, individually, and as a representative of a Class of Participants and Beneficiaries of The Iron Mountain Companies 401(k) Plan,<br><br>        Plaintiffs,<br><br>        v.<br><br>IRON MOUNTAIN INCORPORATED, BOARD OF DIRECTORS OF IRON MOUNTAIN INCORPORATED, and RETIREMENT PLAN COMMITTEE OF IRON MOUNTAIN INCORPORATED,<br><br>        Defendants. | Case No.  1:24-cv-11239-GAO<br><br>Class Action Complaint for Claims Under 29 U.S.C. §1132(a)(2) |

**FIRST AMENDED CLASS ACTION COMPLAINT**

COMES NOW Plaintiffs, Rodney Barnett and Heather Wolff ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries of the Iron Mountain Companies 401(k) Plan (the "Plan" or "Iron Mountain Plan"), by their counsel, WALCHESKE & LUZI, LLC, SCHNEIDER WALLCE COTTRELL KONECKY LLP, and JONATHAN M. FEIGENBAUM, ESQ., as and for a claim against Defendants, alleges and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

**<u>INTRODUCTION</u>**

1.        Plaintiffs are "participants" in a defined-contribution plan under ERISA Section 3(7), 29 U.S.C. § 1002(7): The Iron Mountain Companies 401(k) Plan (the "Plan" or "Iron Mountain Plan").

1

2.      The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34). In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 575 U.S. 5, 525 (2015.)

3.      As a defined-contribution plan, the Plan allows participants to direct the investment of their contributions, but the investment options included in the Plan are selected by the Plans' fiduciaries, as are the Plan service providers.

4.      Iron Mountain Incorporated ("Iron Mountain"), through its Board of Directors, is the Plan Sponsor and fiduciary of the Plan. Iron Mountain and its Board of Directors assigned fiduciary management and administrative duties to the Retirement Benefits Committee of Iron Mountain Incorporated ("Plan Committee") and to their members.

5.      Plaintiff alleges two ERISA violations against Defendants: a violation of the duty of prudence against the Plan Committee under 29 U.S.C. § 1104(a)(1) for paying excessive Total recordkeeping and administrative ("RKA") fees to John Hancock/Fidelity Retirement Plan Services ("John Hancock/Fidelity") and Fidelity Investments Institutional ("Fidelity") and other non-John Hancock/Fidelity service providers;[1] and a claim against Iron Mountain and its Board of Directors for failure to monitor fiduciaries on the Plan Committee with regard to Plan Total RKA fees.

6.      Count I alleges breach of fiduciary duty of prudence by Defendant Plan Committee for incurring unreasonable and imprudent Total RKA fees. Among other things, Defendant Plan Committee *paid over 220% premium per-participant* for Total RKA fees for the Plan to the Plan

---

[1] Fidelity became the Plan recordkeeper effective June 30, 2022. John Hancock, or its predecessor, New York Life whose recordkeeping business it bought in 2015, had been the Plan recordkeeper since at least 2009 to June 2022.

recordkeeper, John Hancock/Fidelity, as well as to other non-John Hancock/Fidelity service providers, during the Class Period.

7.     Defendant Plan Committee should have lowered the Plan's Total RKA expenses by soliciting bids from competing providers for the same RKA services and using the Plan's massive size and correspondent bargaining power to negotiate for fee rebates for the benefit of the Plan and its participants. But the Plan Committee did not do so for many years or did so ineffectively, reflected in the excessive Total RKA fees paid to John Hancock/Fidelity.

8.     Counts II alleges a breach of fiduciary duty by Iron Mountain and its Board for failing to monitor those members of the Plan Committee responsible for paying reasonable Total RKA.

9.     Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

10.     "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528–29. The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2002) (citing *Tibble*, 575 U.S. at 529–30). This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575

3

U.S. at 529–30, and includes two related components. *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*").

11.    First, the duty of prudence requires a plan fiduciary to systematically review the plan's funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment.

12.    Second, the duty of prudence requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *Tibble*, 843 F.3d at 1197 (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3)). "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525.

13.    Plan fiduciaries have a continuing duty to monitor RKA fees to make sure that they are not excessive with respect to the services received. *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) ("[A] trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3)); *Tibble*, 575 U.S. at 525.)

14.    Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes II*, 63 F.4th at 625-626.

15.    During the putative Class Period (May 8, 2018, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan

to "pay[ ] excessive recordkeeping [and administrative Total (RKA)] fees," *Hughes*, 142 S. Ct. at 739-740, to John Hancock/Fidelity and to other non-John Hancock/Fidelity service providers and by failing to remove John Hancock/Fidelity and those other service providers in a timely and prudent manner.

16.    ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Total RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

17.    There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.,* 835 F.3d 670, 678 (7th Cir. 2016.)

18.    The unreasonable Total RKA fees paid inferentially and plausibly establish that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Total RKA services, given their level and quality, were improvident. The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F.4th at 628.

19.    These breaches of fiduciary duty caused Plaintiffs and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees.

20.    To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1132(e)(1), which provides for exclusive federal jurisdiction of fiduciary actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

22.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides nationwide service of process.

23.    Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

24.    In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

25.    Plaintiff, Rodney Barnett, is a resident of the State of Tennessee and currently resides in Smyrna, Tennessee, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

26.    Plaintiff Barnett was a courier for Iron Mountain from 2005-2022. His employment took place in Antioch, Tennessee.

27.    During the Class Period, Plaintiff Barnett invested in the following investments: New York Life Anchor Stable Value Fund, T. Rowe Price Retire 2035 Fund, FIAM Core Plus Fund, and Fidelity 500 Index. Plaintiff Barnett is a current participant in the Plan.

28.    Plaintiff, Heather Wolff, is a resident of the State of Ohio and currently resides in Mainesville, Ohio, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

29.    Plaintiff Wolff was a business development representative for Iron Mountain from April 2020 to January 2024. Her employment took place in Mainesville, Ohio.

30.    During the Class Period, Plaintiff Wolff invested in the following investments: T. Rowe Price Retire 2035 Fund. Plaintiff Wolff rolled out of the Plan in January 2024.

31.    Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan accounts through paying excessive Total RKA fees and during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining John Hancock/Fidelity and New York Life as their recordkeepers from 2009 through 2022, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and Class.

32.    Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for all of the losses suffered by the Plan pursuant to 29 U.S.C. § 1109(a), ERISA § 409(a), including relief that sweeps beyond the losses in Plaintiff's account in the Plan.

33.    The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Total RKA fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

34.    Having never managed a very large 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable Total RKA fee levels available to the Plan.

35.    Iron Mountain Incorporated (Iron Mountain) is an enterprise information management services company founded in 1951 and headquartered at One Federal Street, Boston, Massachusetts, 02110. In this Complaint, "Iron Mountain" refers to the named Defendants, and any other subsidiary, related, predecessor, and successor entities to which these allegations pertain.

36.     Iron Mountain acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Iron Mountain and its Board appointed other Plan fiduciaries on the Plan Committee and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Iron Mountain and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

37.     The Plan is administered by the Plan Committee. As the Plan Administrator, the Plan Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

38.     In 2022, the Plan had $651,327,224 in assets entrusted to the care of the Plan's fiduciaries. As a result, the Plan has the tremendous bargaining power to demand low-cost administrative fees. Defendants, however, did not regularly monitor John Hancock/Fidelity to ensure that John Hancock/Fidelity remained the prudent and objectively reasonable choices to provide Total RKA services.

39.     With 11,474 participants in 2022, the Plan had more participants than 99.86% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year. Similarly, with $651,327,224 in assets in 2022, the Plan had more assets than 99.78% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

40.     Employers must: (1) establish a prudent process for selecting service providers and reviewing investments; (2) ensure that fees paid to service providers are reasonable in light of the

level and quality of services provided; and (3) monitor service providers and investments once selected to make sure they continue to be prudent choices.

**Retirement Plan Services ("RKA")**

41.    Defined contribution plan fiduciaries of very large 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with a prudent and materially identical level and caliber of services. John Hancock and Fidelity are two of the largest of such recordkeepers.

42.    There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to very large defined contribution plans like the Iron Mountain Plan.

43.    The cost of RKA services depends on the number of participants, not the amount of assets in the participant's account.

44.    Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

45.    There are at least three types of RKA services provided by all recordkeepers and other service providers.

46.    The first type, "Bundled RKA," may include, but are not limited to:

    a.    Recordkeeping;

b.     Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.     Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.     Maintenance of an employer stock fund;

f.     Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.     Plan consulting services including assistance in selecting the investments offered to participants;

h.     Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.     Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.     Compliance testing to ensure the plan complies with Internal Revenue non-discrimination rules; and

k.     Trustee/custodian services.

47.    According to the April 22, 2024, Required Disclosure Information for The Iron Mountain Companies 401(k) Plan, "[p]lan administrative fees may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan."

48.    This is boilerplate language that suggests that John Hancock/Fidelity is not providing anything exceptional, unusual, or customized, about the Bundled RKA services provided to Iron Mountain Plan participants.

49.    RKA services are necessary for every defined contribution plan. RKA services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

50.    In other words, the Plan provided participants all the commoditized RKA services provided to all other very large 401(k) plan participant. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by John Hancock/Fidelity and other non-John Hancock/Fidelity service providers. Any differences in RKA services are immaterial to the price quoted by recordkeepers other service providers for such services.

51.    Bundled RKA services are largely standardized because the RKA providers must provide these services at scale to a large number of plans and must comply with regulatory requirements.  They cannot offer customized sets of services to each individual plan.

52.    The bulk of the fee paid for Bundled RKA services pays for core services that do not vary from plan to plan.

53.    Industry experts have maintained for years that for very large retirement plans like the Iron Mountain Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating*

*401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefi-duciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services   (Feb. 10, 2015.)

54.    Because Bundled RKA services are commoditized, recordkeepers primarily differ-entiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for very large plans like the Plan.

55.    RKA services are essentially fungible and the market for them is highly competi-tive. This highly competitive RKA market is filled with equally capable recordkeepers and other non-John Hancock/Fidelity service providers, who can provide comparable Bundled RKA services for less if only asked to provide bids to very large plans like the Iron Mountain Plan.

56.    Given the very large size of the Iron Mountain Plan, the same price paid by the Iron Mountain Plan for Bundled RKA services to John Hancock/Fidelity and other non-John Han-cock/Fidelity service providers over the Class Period, and the trend of price compression for Bun-dled RKA services over the last six years, it is possible to infer that Defendants did not engage in any competitive solicitation of RKA service bids until it replaced John Hancock with Fidelity in June 2022, and even that process was ineffective given that the Plan continued to pay Fidelity excessive Total RKA fees.

57.    The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

       a.    Loan processing;

       b.    Brokerage services/account maintenance;

    c.     Distribution services; and

    d.     Processing of Qualified Domestic Relations Orders (QDROs).

58.    The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

59.    The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the Total RKA fees.

60.    Total RKA fee numbers represent the best methodology for determining apples-to-apples comparisons of plans as far as what is being charged to plan participants for Total RKA.

61.    It is irrelevant whether John Hancock/Fidelity or other plan service providers receive those fees from Plan participants, as Plan participants are paying for these services out of their individual accounts.

62.    The methodology utilized in this Complaint for calculating the Total RKA for both the Iron Mountain Plan and for the comparison plans discussed below contains the following seven steps:

    a.  taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

    b.  reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

    c.  reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

    d.  Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether

each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e.  utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f.   reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether any revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g.  reviewing the results for reasonableness and make revisions as appropriate based on Plaintiff's non-testifying experts experience in evaluating plans at the different recordkeepers.

63.    Because the Total RKA offerings are fungible among all recordkeepers and other non-service providers who provide services to very large plans, like the Iron Mountain Plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the "revenue requirement" is on a per participant basis for providing the Total RKA services.

64.    This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and other service providers and then the summary of the evaluations created by the retirement plan consultants and advisors.

65.     Fidelity, the largest 401k recordkeeper in the country, has in fact conceded in an-
other recent case that the Total RKA services that it provides to mega plans are commodified,
including the plan services provided to its own employees.

66.     As part of stipulated facts in a previous case, Fidelity stated: "The value of the
recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value
of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per
participant, per year, and the value of the recordkeeping services that Fidelity has provided to the
Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan
that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have
obtained recordkeeping services for these amounts during these periods. *The Plan did not receive
any broader or more valuable recordkeeping services from Fidelity than the services received by
any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (No-
vember 18, 2014 to the present)*." See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipu-
lation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

67.     By the start of, and during the entire Class Period, the level of fees that recordkeep-
ers and other service providers have been willing to accept for providing total RKA has stabilized,
and has not materially changed for very large plans, including the Iron Mountain Plan.

68.     Reasonable total RKA fees paid throughout the Class Period in 2021 are therefore
representative of the reasonable fees during the entire Class Period. *See The Economics of Provid-
ing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

69.     The investment options selected by plan fiduciaries often have a portion of the total
expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf
of the investment manager.

70.    Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

71.    The Iron Mountain Plan paid both direct and indirect RKA fees during the Class Period to John Hancock/Fidelity and to other non-John Hancock/Fidelity service providers.

72.    The comparator plans either paid direct and indirect RKA fees or only direct RKA fees, but indirect compensation was taken into consideration for both the Iron Mountain Plan and the comparator plans.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RETIEMENT PLAN SERVICE PROVIDERS

73.    Prudent plan fiduciaries ensure they are paying only reasonable fees for RKA by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/re-source-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Give all [retirement plan service providers] complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This infor-mation should include the number of plan participants and the amount of plan assets as of a spec-ified date.")

74.    Prudent plan fiduciaries can easily receive a quote from other RKA providers to determine if the current level of Total RKA fees is reasonable in light of the level and quality of RKA fees. It is not a cumbersome or expensive process.

75.    It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.")

76.    Having received bids, prudent plan fiduciaries can negotiate with their current RKA providers for a lower fee or move to a new RKA provider to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary.

77.    An internal benchmarking survey from CapTrust, Fiduciary Decisions, or similar benchmarking service providers, is inadequate to determine a reasonable Total RKA fee. Such surveys skew to higher "average prices," that favor inflated Total RKA fees. To receive a "reasonable" total RKA fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a periodic basis.

78.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

79.    First, a hypothetical prudent fiduciary tracks RKA provider's expenses by demanding documents that summarize and contextualize their compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

80. Second, to make an informed evaluation as to whether a RKA provider is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's RKA provider.

81. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RKA rates that are available. By soliciting bids from other RKA providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of RKA services.

82. Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626 (although "a fiduciary *need not constantly solicit quotes* for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and *fail to take action to mitigate excessive fees—such as by* adjusting fee arrangements, *soliciting bids*, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence.") (emphasis added).

## THE PLAN PAID UNREASONABLE TOTAL RKA FEES

83. A plan fiduciary must monitor its Total RKA fees on an ongoing basis by regularly conducting an independent evaluation of those fees to ensure they are reasonable and remove RKA providers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

84. During the Class Period, Defendants egregiously failed to regularly monitor the Plan's Total RKA fees paid to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers.

85.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from RKA providers, including but not limited to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers, in order to avoid paying unreasonable Total RKA fees.

86.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Total RKA fees it paid to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers, and in light of the level and quality of Total RKA services it received that were materially similar to services available through other RKA providers and provided to other very large plans.

87.    As set forth in the table below, from the years 2018 through 2023, based upon information provided in 5500 Forms filed with the Department of Labor (DOL) and in participant quarterly account statements, the Plan paid an effective average annual total RKA fee of $100 per participant.

### Total Recordkeeping and Administration (Total RKA) Fees

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Average |
|---|---|---|---|---|---|---|---|
| Participants | 12,524 | 12,192 | 12,088 | 12,372 | 11,474 | 11,474 | 12,021 |
| Est. Total RKA Fees | $655,804 | $856,019 | $879,984 | $1,883,723 | $2,121,585 | $803,180 | $1,200,049 |
| Est. Total RKA Per Participant | $52 | $70 | $73 | $152 | $185 | $70 | $100 |
| Reliable Est. of Reasonable Total RKA Fees | $413,292 | $402,336 | $398,904 | $408,276 | $378,642 | $378,642 | $396,682 |
| Reliable Est. of Reasonable Total RKA Fees Per PP | $33 | $33 | $33 | $33 | $33 | $33 | $33 |

88.    The table below illustrates the annual Total RKA fees paid by other similarly sized, comparable plans, receiving a materially similar level and quality of Total RKA services, compared to the average annual Total RKA fees paid by the Plan (as identified in the table above).

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2021 Form 5500 information or the most recent Form 5500 if 2021 is not available)

| Plan | Partici-pants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| ADM 401K and Employee Stock Owner-ship Plan for Salaried Employees | 10,308 | $413,157 | $40 | Fidelity |
| Operating Engineers Local 66 Annuity and Savings Fund | 10,486 | $305,305 | $29 | John Han-cock/Fidelity |
| Thoroughbred Retirement Investment Plan of Norfolk Southern Corporation and Participating Subsidiary Companies | 12,296 | $589,386 | $48 | Vanguard |
| SkyWest, Inc. Employees' Retirement Plan | 12,298 | $507,665 | $41 | Schwab |
| **IRON Mountain Plan 2021 Fee** | **12,372** | **$1,883,723** | **$152** | **John Han-cock/Fidelity** |
| Fortive Retirement Savings Plan | 12,758 | $429,890 | $34 | Fidelity |
| Sutter Health Retirement Income Plan | 13,824 | $276,872 | $20 | Fidelity |

89.     To determine the Total RKA fees that other comparable plans are paying, Plaintiffs considered both the direct and indirect compensation collected as disclosed on publicly available Form 5500s.

90.     To ensure meaningful, apples-to-apples comparisons, Plaintiffs utilized the same methodology to compare the fees of the Plan with the fees of other similarly situated and comparable plans.

91.     The direct compensation paid by the plans to their recordkeepers is derived from Item 2 of Part 1 of Schedule C.

92.     In some cases, the comparable plans disclose that their recordkeepers do not receive any indirect compensation. In those cases, therefore, the direct compensation represents the full amount of compensation paid by the plans to the recordkeeper.

93.      When the plans disclose that they did receive indirect compensation, the amount of indirect compensation is derived from multiplying the revenue sharing/pricing credit rates for

each investment option times the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i.

94.     The revenue sharing rates/pricing credit rates are either disclosed on Item 3 of Part 1 of Schedule C or are commonly known in the industry and are also publicly available and provided by recordkeepers and their custodians.

95.     Additionally, in some cases, the notes to the Financial Statements filed by the plan fiduciaries as attachments to Form 5500 provide information related to pricing credits and other revenue sharing credits that may serve to reduce the RKA fees paid by the plan.

96.     The Plan's Total RKA fee rate range of $52/pp to $185/pp throughout the relevant period can be compared to the much lower Total RKA fee rate of other comparable plans, when available.

97.     Each of the meaningfully comparable plans identified below is among the closest 5/100th of 1% (0.05%) of all the defined contribution plans covered by ERISA.

98.     There were around 690,128 plans in 2021 and only 3,516 plans had between 10,308 and 13,824 participants with a balance greater than zero at year-end. Therefore, 686,612 plans or 99.95% of all plans have either less than 10,308 or more than 13,824 participants.

99.     Plans containing between 10,308 and 13,824 participants are among the most meaningful and appropriate to use as similarly situated comparable plans and are superior to the remaining 99.95% of all the defined contribution plans governed by ERISA in 2021.

100.    **ADM 401K and Employee Stock Ownership Plan For Salaried Employees** ("ADM"): The reliable estimate of $40/pp is comprised of $40/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value

of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

101.    The ADM Plan is a meaningful benchmark because at the end of 2021 the ADM plan had around 10,308 participants, slightly less than the 12,372 participants in the Plan at the end of 2021. As noted above, the ADM Plan is among the closest 0.05% of all defined contribution plans covered by ERISA.  The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the ADM Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the ADM plan and the fees paid by the Plan.

102.    For example, the 2021 disparity of $112/pp between the $40/pp Total RKA rate for the ADM Plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,380,000 annually and would conservatively represent more than 27,600 hours of RKA services in one year provided by employees of the recordkeeper.

103.    If at the end of 2021 the ADM Plan can obtain a Total RKA fee of $40/pp with 10,308 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $40/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

104.    **Operating Engineers Local 66 Annuity and Savings Fund** ("Operating Engineers"): The reliable estimate of $29/pp is comprised of $29/pp of direct compensation paid to John Hancock/Fidelity from Form 5500 Schedule C and, to the extent that the recordkeeper re-

ceived indirect compensation,  a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

105.    The Operating Engineers Plan is a meaningful benchmark because at the end of 2021 the Operating Engineers Plan had around 10,486 participants, slightly less than the 12,372 participants in the Plan at the end of 2021. As noted above, the Operating Engineers plan is among the closest 0.05% of all defined contribution plans covered by ERISA.  The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Operating Engineers Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Operating Engineers Plan and the fees paid by the Plan.

106.    For example, the 2021 disparity of $123/pp between the $29/pp Total RKA rate for the Operating Engineers Plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,520,000 annually and would conservatively represent more than 30,400 hours of RKA services in one year provided by employees of the recordkeeper.

107.    If at the end of 2021 the Operating Engineers Plan can obtain a Total RKA fee of $29/pp with 10,486 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $29/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

108.    **Thoroughbred Retirement Investment Plan of Norfolk Southern Corporation and Participating Subsidiary Companies** ("Norfolk"): The reliable estimate of $48/pp is comprised of $48/pp of direct compensation paid to Vanguard from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

109.    The Norfolk Plan is a meaningful benchmark because at the end of 2021 the Norfolk plan had around 12,296 participants, slightly less than the 12,372 participants in the Plan at the end of 2021. As noted above, the Norfolk plan is among the closest 0.05% of all defined contribution plans covered by ERISA.  The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Norfolk plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Norfolk plan and the fees paid by the Plan.

110.    For example, the 2021 disparity of $104/pp between the $48/pp Total RKA rate for the Norfolk Plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,290,000 annually and would conservatively represent more than 25,800 hours of RKA services in one year provided by employees of the recordkeeper.

111.    If at the end of 2021 the Norfolk Plan can obtain a Total RKA fee of $48/pp with 12,296 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $48/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

112.    **SkyWest, Inc. Employees' Retirement Plan** ("SkyWest"): The reliable estimate of $41/pp is comprised of $41/pp of direct compensation paid to Schwab from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

113.    The SkyWest Plan is a meaningful benchmark because at the end of 2021 the SkyWest Plan had around 12,298 participants, slightly less than the 12,372 participants in the Plan at the end of 2021. As noted above, the SkyWest Plan is among the closest 0.05% of all defined contribution plans covered by ERISA.  The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the SkyWest Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the SkyWest plan and the fees paid by the Plan.

114.    For example, the 2021 disparity of $111/pp between the $41/pp Total RKA rate for the SkyWest plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,370,000 annually and would conservatively represent more than 27,400 hours of RKA services in one year provided by employees of the recordkeeper.

115.    If at the end of 2021 the SkyWest Plan can obtain a Total RKA fee of $41/pp with 12,298 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $41/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

116.    **Fortive Retirement Savings Plan** ("Fortive"): The reliable estimate of $34/pp is comprised of $34/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

117.    The Fortive Plan is a meaningful benchmark because at the end of 2021 the Fortive plan had around 12,758 participants, slightly more than the 12,372 participants in the Plan at the end of 2021. As noted above, the Fortive Plan is among the closest 0.05% of all defined contribution plans covered by ERISA.  The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Fortive Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Fortive Plan and the fees paid by the Plan.

118.    For example, the 2021 disparity of $119/pp between the $34/pp Total RKA rate for the Fortive plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,460,000 annually and would conservatively represent more than 29,200 hours of RKA services in one year provided by employees of the recordkeeper.

119.    If at the end of 2021 the Fortive Plan can obtain a Total RKA fee of $34/pp with 12,758 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $34/pp.

120.    **Sutter Health Retirement Income Plan** ("Sutter"): The reliable estimate of $20/pp is comprised of $20/pp of direct compensation paid to Fidelity from Form 5500 Schedule

C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

121.    The Sutter Plan is a meaningful benchmark because at the end of 2021 the Sutter Plan had around 13,824 participants, slightly more than the 12,372 participants in the Plan at the end of 2021. As noted above, the Sutter Plan is among the closest 0.05% of all defined contribution plans covered by ERISA.  The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Sutter Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Sutter Plan and the fees paid by the Plan.

122.    For example, the 2021 disparity of $132/pp between the $20/pp Total RKA rate for the Sutter Plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,630,000 annually and would conservatively represent more than 32,600 hours of RKA services in one year provided by employees of the recordkeeper.

123.    If at the end of 2021 the Sutter Plan can obtain a Total RKA fee of $20/pp with 13,824 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $20/pp.

124.    Viewing all the data points provided by the comparable plans set forth above holistically and in the full context of how the retirement plan industry operates supports a reasonable inference that the Plan paid unreasonable and excessive fees for Total RKA services.

125.    The market for RKA services is not transparent. Recordkeepers do not provide transparency related to the fees they charge all their clients, nor do they provide transparency related to the bids they provided throughout the Class Period for other plans with a similar number of participants as the Plan.

126.    Recordkeepers are able to negotiate at arm's length with plan fiduciaries and will accept higher fees from plan fiduciaries who are unaware of the reasonable market rate through, for example, failing to solicit competitive bids, among other reasons.

127.    Due to the lack of transparency, the primary and most significant driver of the disparity between the actual RKA fees paid by plans with similar numbers of participants greater than around 2,000 is the actual practices of the plans' fiduciaries.

128.    The most plausible explanation of the disparity of between $20/pp and $48/pp from the comparable plans and the Plan is that the Plan's fiduciaries engaged in imprudent conduct.

129.    The disparity between the fee rates of the comparable plans, based on the amount of participants in each of the plans, and the reasonable rate, based on the trend line created by the comparable plans fee rates, is less than $28 per participant and is most plausibly explained by minor variations in negotiation tactics and circumstances among the fiduciaries of the comparable plans and the various recordkeepers.

130.    This lack of disparity in the comparable plans is in stark contrast to the disparity of $72 per participant paid by the Plan compared to the reliable estimate of a reasonable Total RKA fee rate for a plan with 12,130 participants of around $33 per participant per year.

131.    The amount of assets in a plan has little to no impact on the costs to the record-keeper, so any differences in the amount of assets in the comparable plans compared to the Plan has no impact on whether the comparable plans make meaningful benchmarks.

132.    The comparator plans serviced by other recordkeepers and who charged less received materially the same level and quality of total RKA services given that these services are fungible and commodified for very large plans like the Iron Mountain Plan. Indeed, each of these plans note in their fee disclosures and other Plan documents that they received RKA services materially similar to the Iron Mountain Plan in the form of recordkeeping, trustee, accounting, and other administrative services.

133.    Although some of the comparator utilize different service or compensation codes for the services received on the 5500 Form, the fact remains the Total RKA fees are fungible and commoditized and any differences between the plans in these codes are immaterial from a pricing perspective.

134.    The graph below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes, receiving a materially similar level and quality of RKA services in 2021, compared to the 2021 Total RKA fees paid by the Iron Mountain Plan, with the white data points representing Total RKA fees paid by comparable plans.



135.    The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several RKA service providers serving the mega market would be willing to accept in a competitive environment to provide total RKA services to the Iron Mountain Plan.

136.    For the 2021 Plan year, the table above illustrates that the Plan paid an effective average annual total RKA fee of $152 per participant.

137.    A reasonable Total RKA fee for the Iron Mountain Plan in 2021 based on the services provided by existing RKA service providers and the Plan's features, based on graph and charts above, would have been $33 per participant.

138.    The Total RKA fees paid by the Plan to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers during 2018-2023 were also excessive relative to the RKA services rendered. More specifically, a disparity of $67 per participant (over 203% premium) for materially similar Total RKA services existed during the Class Period.

139.    From the years 2018 through 2023 and based upon information derived from the Plan 5500 Forms in similarly sized plans and from participant quarterly account statements, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $1,200,049 per year in Total RKA fees, which equated to an effective average of approximately $100 per participant per year.

140.    From the years 2018 through 2023, and based upon information derived from the Plan 5500 Forms in similarly sized plans and from participant quarterly account statements, as compared to other plans of similar sizes receiving a materially similar level and quality of Total RKA services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for total RKA of approximately $396,682 per year, which equates to approximately $33 per participant per year.

141.    During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *a 203% premium* for what they could otherwise pay for the materially similar level and quality of Total RKA services.

142.    From the years 2018 through 2023 and based upon information derived from the Plan 5500 Forms, the Plan additionally cost its participants on average approximately $803,367 per year in unreasonable and excessive Total RKA fees, which equates to, on average, approximately $67 per participant per year.

143.    From the years 2018 to 2023, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of Total RKA services, the Plan actually cost its participants a total minimum amount of approximately $4,820,203 in unreasonable and excessive Total RK&A fees.

144.    From the years 2018 to 2023, based upon information derived from the Plan 5500 Forms and from participant quarterly account statements, because Defendants did not act prudently, and as compared to other plans of similar sizes and with a materially similar level and quality of services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $5,567,571 in Total RKA fees.

145.    Defendants could have received Total RKA services during the Class Period of the same level and quality from John Hancock/Fidelity and other non-John Hancock/Fidelity service providers that provide RKA services to very large plans, like the Iron Mountain plan, because the Plan 5500 Forms establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above.

146.    Defendants failed to take advantage of the Plan's substantial size to timely negotiate lower fees from John Hancock/Fidelity and other non-John Hancock/Fidelity service providers.

147.    Defendants could have obtained the materially same Total RKA services for less from other RKA providers or from John Hancock/Fidelity and other existing non-John Hancock/Fidelity service providers had the Plan only leveraged its substantial size on the RKA provider marketplace in a more timely and prudent manner.

148.    Defendants did not conduct effective or competitive bidding for Total RKA services during the Class Period and failed to use the Plan's substantial size to negotiate rebates from John Hancock/Fidelity and the non-John Hancock/Fidelity service providers.

149.    Plaintiffs and Class Members paid these excessive Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

150.    During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Total RKA fees it paid to John Hancock/Fidelity and the non-John Hancock/Fidelity service providers, it would have realized that the Plan was compensating John Hancock/Fidelity and the non-John Hancock/Fidelity service providers unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and other Plan participants.

151.    Defendants should have removed John Hancock/Fidelity and the non-John Hancock/Fidelity service providers as Plan RKA providers during the Class Period. Instead, it kept John Hancock/Fidelity and the non-John Hancock/Fidelity service providers at these inflated total RKA fee prices.

152.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total RKA fees than they should have been and/or by failing to take effective and timely remedial actions including removing John Hancock/Fidelity and the non-John Hancock/Fidelity service providers as the Plan RKA providers, Defendants breached their fiduciary duty of prudence to Plaintiffs and to other Plan participants, causing millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

153.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action in a representative capacity on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

154.    In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seeks to certify, and to be appointed as representative of, the following Class:

All participants and beneficiaries of the Iron Mountain 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 7, 2018, and running through the date of judgment.

155.    The Class includes near to 12,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

156.    There are questions of law and fact common to the two combined Subclasses pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties to the Plan;

c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

157.    Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

158.    Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

159.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and

beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

160.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the subclasses as a whole.

161.    Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

162.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

163.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

164.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

165.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

### FIRST CLAIM FOR RELIEF
**Breach of Duty of Prudence of ERISA, as Amended
(Plaintiff, on behalf of themselves and Class, Against
Defendant Plan Committee – Total RKA Fees)**

166.    Plaintiffs restate the above allegations as if fully set forth herein.

167.    Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

168.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

169.    Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting RKA providers that charge objectively reasonable Total RKA fees.

170.    During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's Total RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

171.    During the Class Period, Defendant Plan Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's Total RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

172. During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's RKA providers, John Hancock/Fidelity and the non-John Hancock/Fidelity service providers, to make sure they were providing the Total RKA services at reasonable costs, given the highly competitive, commodified market surrounding RKA services and the enormous bargaining power the Plan had to negotiate the best fees, and remove John Hancock/Fidelity and the other non-John Hancock/Fidelity service providers if they provided RKA services at objectively unreasonable fee levels.

173. During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's RKA services critically or objectively in comparison to other RKA provider options.

174. Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

175. As a result of Defendant Plan Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

176. Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Iron Mountain Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits

resulting from the breaches of fiduciary duties alleged in this Count. In addition, the Defendant

Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Defendants Iron Mountain and Board – Total RKA Fees)**

177.    Plaintiffs restate the above allegations as if fully set forth herein.

178.    Defendants Iron Mountain and Board had the authority to appoint and remove

members or individuals responsible for Plan Total RKA fees on the Plan Committee and knew or

should have known that these fiduciaries had critical responsibilities for the Plan.

179.    In light of this authority, Defendants Iron Mountain and Board had a duty to mon-

itor those individuals responsible for Plan Total RKA fees on the Plan Committee to ensure that

they were adequately performing their fiduciary obligations, and to take prompt and effective ac-

tion to protect the Plan in the event that these individuals were not fulfilling those duties.

180.    Defendants Iron Mountain and Board had a duty to ensure that the individuals re-

sponsible for Plan Total RKA fees possessed the needed qualifications and experience to carry out

their duties (or use qualified advisors and service providers to fulfill their duties); had adequate

financial resources and information; maintained adequate records of the information on which they

based their decisions and analysis with respect to the Plan's Total RKA fees; and reported regularly

to Defendants Iron Mountain and Board.

181.    The objectively unreasonable and excessive Total RKA fees paid by the Plan infer-

entially establish that Defendants Iron Mountain and Board breached their duty to monitor by,

among other things:

> a.    Failing to monitor and evaluate the performance of individuals re-
> sponsible for Plan Total RKA fees on the Plan Committee or have a
> system in place for doing so, standing idly by as the Plan suffered

significant losses in the form of objectively unreasonably Total RKA expenses;

b.    Failing to monitor the process by which the Plan's RKA providers, John Hancock/Fidelity and the other non-John Hancock/Fidelity service providers, were evaluated and failing to investigate the availability of more reasonably-priced RKA providers; and

c.    Failing to remove individuals responsible for Plan Total RKA fees on the Plan Committee whose performance was inadequate in that these individuals continued to pay the same Total RKA costs over numerous years even though solicitation of competitive bids would have shown that maintaining John Hancock/Fidelity and the other non-John Hancock/Fidelity service providers as the RKA providers at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiffs' and other Plan participants' retirement savings.

182.    As the consequences of the breaches of the duty to monitor for Total RKA fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

183.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Iron Mountain and Board are liable to restore to the Iron Mountain Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Total RKA fees on the Plan Committee. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D.      An Order compelling Defendants to make good to Plan all losses to the Plan result-
        ing from Defendants' breaches of fiduciary duty, including restoring to Plan all
        losses resulting from paying unreasonable Total RKA fees, and restoring to Plan
        all profits the Defendants made through use of the Plan's assets, and restoring to
        the Plan all profits which the participants would have made if the Defendants had
        fulfilled their fiduciary obligations;

E.      An Order requiring Iron Mountain to disgorge all profits received from, or in re-
        spect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the
        form of an accounting for profits, imposition of constructive trust, or surcharge
        against Iron Mountain as necessary to effectuate relief, and to prevent Iron Moun-
        tain' unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary
        responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the
        provisions of ERISA as may be appropriate, including appointment of an independ-
        ent fiduciary/consultant or fiduciaries to run the Plan and removal of plan
        fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest at no less than the Massachusetts

        statutory rate of 12% simple interest per annum;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the
        common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: May 13, 2024                    **RODNEY BARNETT and HEATHER WOLFF**

/s/ Jonathan M. Feigenbaum
Jonathan M. Feigenbaum
184 High Street, Suite 503
Boston, MA 02110
Telephone: (617) 357-9700
E-Mail: jonathan@erisaattorneys.com

**WALCHESKE & LUZI, LLC**

Paul M. Secunda*
*Pro Hac Vice Motion to be filed*
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

**SCHNEIDER WALLCE COTTRELL
KONECKY LLP**

James A. Bloom*
Todd M. Schneider*
*Pro Hac Vice Motion to be filed*
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Fax: (415) 421-7105
jbloom@schneiderwallace.com
tschneider@schneiderwallace.com

*Attorneys for Plaintiffs and Proposed Class*

41

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2024, a copy of the foregoing was electronically filed with the Court.  Notice of this filing will be sent by operations of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.  All parties have registered with the Court's electronic filing system. Given that a summons and complaint has not been served, notice is not being sent to any attorneys.

*/s/ Jonathan M. Feigenbaum*