# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RODNEY BARNETT and HEATHER WOLFF, individually, and as a representative of a Class of Participants and Beneficiaries of The Iron Mountain Companies 401(k) Plan, <br><br> Plaintiffs, <br><br> v. <br><br> IRON MOUNTAIN INCORPORATED, BOARD OF DIRECTORS OF IRON MOUNTAIN INCORPORATED, and RETIREMENT PLAN COMMITTEE OF IRON MOUNTAIN INCORPORATED, <br><br> Defendants. | Case No. 1:24-cv-11239-GAO |

## ANSWER TO FIRST AMENDED COMPLAINT

Defendants IRON MOUNTAIN INCORPORATED ("Iron Mountain") and

RETIREMENT PLAN COMMITTEE OF IRON MOUNTAIN INCORPORATED (the

"Committee") hereby submit their Answer to Plaintiffs' First Amended Complaint as follows:

## INTRODUCTION

### COMPLAINT ¶1:

Plaintiffs are "participants" in a defined-contribution plan under ERISA Section 3(7), 29 U.S.C. § 1002(7): The Iron Mountain Companies 401(k) Plan (the "Plan" or "Iron Mountain Plan").

### ANSWER:

Paragraph 1 of the First Amended Complaint contains legal conclusions to which no

response is required. To the extent a response is required, Defendants admit that Plaintiffs

Rodney Barnett and Heather Wolff are participants in the Iron Mountain Companies 401(k) Plan

(the "Plan"). Defendants admit the Plan is a defined contribution plan. Defendants deny any

remaining allegations in Paragraph 1 of the First Amended Complaint.

## COMPLAINT ¶2:

The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. §
1002(34). In a defined contribution plan, the value of participants' investments is "determined by
the market performance of employee and employer contributions, less expenses." *Tibble v.
Edison Int'l*, 575 U.S. 5, 525 (2015.)

## ANSWER:

Paragraph 2 of the First Amended Complaint contains legal conclusions to which no

response is required. To the extent a response is required, Defendants admit that the Plan is a

defined contribution pension plan. Defendants deny any remaining allegations in Paragraph 2 of

the First Amended Complaint.

## COMPLAINT ¶3:

As a defined-contribution plan, the Plan allows participants to direct the investment of
their contributions, but the investment options included in the Plan are selected by the Plans'
fiduciaries, as are the Plan service providers.

## ANSWER:

Defendants admit that Plan participants are responsible for directing investment of their

accounts in the Plan. Defendants deny the remaining allegations in Paragraph 3 of the First

Amended Complaint.

## COMPLAINT ¶4:

Iron Mountain Incorporated ("Iron Mountain"), through its Board of Directors, is the Plan
Sponsor and fiduciary of the Plan. Iron Mountain and its Board of Directors assigned fiduciary
management and administrative duties to the Retirement Benefits Committee of Iron Mountain
Incorporated ("Plan Committee") and to their members.

**ANSWER:**

Defendants admit Iron Mountain is the Plan Sponsor. Defendants further admit that the

Committee is the Plan Administrator and named fiduciary of the Plan. Defendants deny any

remaining allegations in Paragraph 4 of the First Amended Complaint.

**COMPLAINT ¶5:**

Plaintiff alleges two ERISA violations against Defendants: a violation of the duty of
prudence against the Plan Committee under 29 U.S.C. § 1104(a)(1) for paying excessive Total
recordkeeping and administrative ("RKA") fees to John Hancock/Fidelity Retirement Plan
Services ("John Hancock/Fidelity") and Fidelity Investments Institutional ("Fidelity") and other
non-John Hancock/Fidelity service providers;[1] and a claim against Iron Mountain and its Board
of Directors for failure to monitor fiduciaries on the Plan Committee with regard to Plan Total
RKA fees.

**ANSWER:**

Defendants admit the allegations in footnote 1. Defendants deny the allegations in

Paragraph 5 of the First Amended Complaint, deny that Plaintiffs have stated any claim that

entitles them to relief, and deny any wrongdoing whatsoever.

**COMPLAINT ¶6:**

Count I alleges breach of fiduciary duty of prudence by Defendant Plan Committee for
incurring unreasonable and imprudent Total RKA fees. Among other things, Defendant Plan
Committee *paid over 220% premium per participant* for Total RKA fees for the Plan to the Plan
recordkeeper, John Hancock/Fidelity, as well as to other non-John Hancock/Fidelity service
providers, during the Class Period.

**ANSWER:**

Defendants deny the allegations in Paragraph 6 of the First Amended Complaint.

**COMPLAINT ¶7:**

Defendant Plan Committee should have lowered the Plan's Total RKA expenses by
soliciting bids from competing providers for the same RKA services and using the Plan's
massive size and correspondent bargaining power to negotiate for fee rebates for the benefit of

---

[1] Fidelity became the Plan recordkeeper effective June 30, 2022. John Hancock, or its predecessor, New York Life
whose recordkeeping business it bought in 2015, had been the Plan recordkeeper since at least 2009 to June 2022.

the Plan and its participants. But the Plan Committee did not do so for many years or did so ineffectively, reflected in the excessive Total RKA fees paid to John Hancock/Fidelity.

**ANSWER:**

Defendants deny the allegations in Paragraph 7 of the First Amended Complaint.

**COMPLAINT ¶8:**

Counts II alleges a breach of fiduciary duty by Iron Mountain and its Board for failing to monitor those members of the Plan Committee responsible for paying reasonable Total RKA.

**ANSWER:**

Defendants deny the allegations in Paragraph 8 of the First Amended Complaint.

Answering further, Plaintiffs have dismissed their claims against the Board.

**COMPLAINT ¶9:**

Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

**ANSWER:**

Paragraph 9 of the First Amended Complaint contains legal conclusions to which no

response is required. To the extent a response is required, Paragraph 9 of the First Amended

Complaint purports to characterize a portion of ERISA, which speaks for itself and is the best

evidence of its provisions. To the extent the allegations in Paragraph 9 of the First Amended

Complaint misstate or mischaracterize ERISA, they are denied.

**COMPLAINT ¶10:**

"In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528-29. The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737,742 (2002) (citing *Tibble*, 575 U.S. at 529-30). This continuing duty to monitor is a subset of the duty of prudence, *Tibble*,

575 U.S. at 529-30, and includes two related components. *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*").

**<u>ANSWER:</u>**

Paragraph 10 of the First Amended Complaint contains legal conclusions and legal arguments to which no response is required. To the extent a response is required, Defendants deny any wrongdoing and deny the remaining allegations in Paragraph 10 of the First Amended Complaint.

**<u>COMPLAINT ¶11:</u>**

First, the duty of prudence requires a plan fiduciary to systematically review the plan's funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment.

**<u>ANSWER:</u>**

Paragraph 11 of the First Amended Complaint contains legal conclusions and legal arguments to which no response is required. To the extent a response is required, Defendants deny any wrongdoing and deny the remaining allegations in Paragraph 11 of the First Amended Complaint.

**<u>COMPLAINT ¶12:</u>**

Second, the duty of prudence requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *Tibble*, 843 F.3d at 1197 (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3)). "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525.

**<u>ANSWER:</u>**

Paragraph 12 of the First Amended Complaint contains legal conclusions and legal arguments to which no response is required. To the extent a response is required, Defendants deny any wrongdoing and deny the remaining allegations in Paragraph 12 of the First Amended Complaint.

312607855v.1

**COMPLAINT ¶13:**

Plan fiduciaries have a continuing duty to monitor RKA fees to make sure that they are not excessive with respect to the services received. *See Tibble v. Edison Intl*, 843 F.3d 1187, 1197 (9th Cir. 2016) ("[A] trustee is to `incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3)); *Tibble*, 575 U.S. at 525.)

**ANSWER:**

The statements in Paragraph 13 of the First Amended Complaint are generic allegations and legal arguments that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants admit that Plaintiffs cite case law, which speaks for itself and is the best evidence of its contents. To the extent that the statements in Paragraph 13 of the First Amended Complaint are inconsistent with or mischaracterize the law, Defendants deny those allegations.

**COMPLAINT ¶14:**

Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes II*, 63 F.4th at 625-626.

**ANSWER:**

The statements in Paragraph 14 of the First Amended Complaint are generic allegations and legal arguments that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants admit that Plaintiffs cite case law, which speaks for itself and is the best evidence of its contents. To the extent that the statements in Paragraph 14 of the First Amended Complaint are inconsistent with or mischaracterize the law, Defendants deny those allegations.

**COMPLAINT ¶15:**

During the putative Class Period (May 8, 2018, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U. S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative Total (RKA)] fees," *Hughes*, 142 S. Ct. at 739-740, to John Hancock/Fidelity and to other non-John Hancock/Fidelity service providers and by failing to remove John Hancock/Fidelity and those other service providers in a timely and pm-dent manner.

**ANSWER:**

Defendants deny the allegations in Paragraph 15 of the First Amended Complaint.

**COMPLAINT ¶16:**

ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Total RKA fees based on what is reasonable (not the cheapest or average) in the applicable market.

**ANSWER:**

Paragraph 16 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any wrongdoing and deny the remaining allegations in Paragraph 16 of the First Amended Complaint.

**COMPLAINT ¶17:**

There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

**ANSWER:**

The statements in Paragraph 17 of the First Amended Complaint are generic allegations and legal arguments that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants admit that Plaintiffs cite case law, which speaks for itself and is the best evidence of its contents. To the extent that the statements in Paragraph 17 of the First Amended Complaint are inconsistent with or mischaracterize the law, Defendants deny those allegations.

**COMPLAINT ¶18:**

The unreasonable Total RKA fees paid inferentially and plausibly establish that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Total RKA services, given their level and quality, were improvident. The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F.4th at 628.

**ANSWER:**

Defendants deny the allegations in Paragraph 18 of the First Amended Complaint.

**COMPLAINT ¶19:**

These breaches of fiduciary duty caused Plaintiffs and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees.

**ANSWER:**

Defendants deny the allegations in Paragraph 19 of the First Amended Complaint.

**COMPLAINT ¶20:**

To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

**ANSWER:**

Defendant admits that Plaintiffs purport to bring an action on behalf of the Plan under 29

U.S.C. §1132(a)(2) to enforce Defendants' alleged liability under 29 U.S.C. §1109(a).

Defendants deny the remaining allegations in Paragraph 20 of the First Amended Complaint.

## JURISDICTION AND VENUE

**COMPLAINT ¶21:**

This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U. S.C. § 1132(e)(1), which provides for exclusive federal jurisdiction of fiduciary actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

312607855v.1

**ANSWER:**

Defendants admit the allegations in Paragraph 21 of the First Amended Complaint.

**COMPLAINT ¶22:**

This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides nationwide service of process.

**ANSWER:**

Defendants admit the allegations in Paragraph 22 of the First Amended Complaint.

**COMPLAINT ¶23:**

Venue is appropriate in this District within the meaning of 29 U. S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

**ANSWER:**

Defendants admit that venue is permitted in this Court pursuant to 29 U.S.C. § 1132(e)(2). Defendants deny the remaining allegations in Paragraph 23 of the First Amended Complaint.

**COMPLAINT ¶24:**

In conformity with 29 U. S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the First Amended Complaint.

**PARTIES**

**COMPLAINT ¶25:**

Plaintiff, Rodney Barnett, is a resident of the State of Tennessee and currently resides in Smyrna, Tennessee, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

**ANSWER:**

Paragraph 25 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, upon information and belief, Defendants admit that Plaintiff Rodney Barnett is a resident of the State of Tennessee and currently resides in Smyrna, Tennessee. Defendants further admit that Plaintiff Barnett has ben a Plan participant during the putative Class Period, as defined in the First Amended Complaint. Defendants deny any wrongdoing and deny the remaining allegations in Paragraph 25 of the First Amended Complaint.

**COMPLAINT ¶26:**

Plaintiff Barnett was a courier for Iron Mountain from 2005-2022. His employment took place in Antioch, Tennessee.

**ANSWER:**

Defendants admit that Plaintiff Barnett was employed by Iron Mountain from 2005-2022, and that his employment took place in Tennessee. Defendants deny the remaining allegations in Paragraph 26 of the First Amended Complaint.

**COMPLAINT ¶27:**

During the Class Period, Plaintiff Barnett invested in the following investments: New York Life Anchor Stable Value Fund, T. Rowe Price Retire 2035 Fund, FIAM Core Plus Fund, and Fidelity 500 Index. Plaintiff Barnett is a current participant in the Plan.

**ANSWER:**

Defendants admit the allegations in Paragraph 27 of the First Amended Complaint.

**COMPLAINT ¶28:**

Plaintiff, Heather Wolff, is a resident of the State of Ohio and currently resides in Mainesville, Ohio, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

**ANSWER:**

Paragraph 28 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, upon information and belief, Defendants admit that Plaintiff Heather Wolff is a resident of the State of Ohio and currently resides in Mainesville, Ohio. Defendants further admit that Plaintiff Wolff was a Plan participant during the putative Class Period, as it is defined in the First Amended Complaint. Defendants deny any wrongdoing and deny the remaining allegations in Paragraph 28 of the First Amended Complaint.

**COMPLAINT ¶29:**

Plaintiff Wolff was a business development representative for Iron Mountain from April 2020 to January 2024. Her employment took place in Mainesville, Ohio.

**ANSWER:**

Defendants admit that Plaintiff Wolff was employed by Iron Mountain from April 2020 to January 2024 and that her employment took place in Ohio. Defendants deny the remaining allegations in Paragraph 29 of the First Amended Complaint.

**COMPLAINT ¶30:**

During the Class Period, Plaintiff Wolff invested in the following investments: T. Rowe Price Retire 2035 Fund. Plaintiff Wolff rolled out of the Plan in January 2024.

**ANSWER:**

Defendants admit that Plaintiff Wolff invested in the T. Rowe Price Retire 2035 Fund, and that Plaintiff Wolff withdrew a portion of her account balance from the Plan in January 2024. Defendants deny the remaining allegations in Paragraph 30 of the First Amended Complaint.

**COMPLAINT ¶31:**

Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan accounts through paying excessive Total RKA fees and

during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining John Hancock/Fidelity and New York Life as their recordkeepers from 2009 through 2022, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and Class.

**ANSWER:**

Defendants deny the allegations in Paragraph 31 of the First Amended Complaint.

**COMPLAINT ¶32:**

Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for all of the losses suffered by the Plan pursuant to 29 U.S.C. § 1109(a), ERISA § 409(a), including relief that sweeps beyond the losses in Plaintiff's account in the Plan.

**ANSWER:**

Defendants deny the allegations in Paragraph 32 of the First Amended Complaint.

**COMPLAINT ¶33:**

The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Total RKA fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

**ANSWER:**

Defendants deny the allegations in Paragraph 33 of the First Amended Complaint.

**COMPLAINT ¶34:**

Having never managed a very large 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable Total RKA fee levels available to the Plan.

**ANSWER:**

Defendants deny the allegations in Paragraph 34 of the First Amended Complaint.

**COMPLAINT ¶35:**

Iron Mountain Incorporated (Iron Mountain) is an enterprise information management services company founded in 1951 and headquartered at One Federal Street, Boston, Massachusetts, 02110. In this Complaint, "Iron Mountain" refers to the named Defendants, and any other subsidiary, related, predecessor, and successor entities to which these allegations pertain.

**ANSWER:**

Defendants admit the allegations in Paragraph 35 of the First Amended Complaint.

**COMPLAINT ¶36:**

Iron Mountain acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Iron Mountain and its Board appointed other Plan fiduciaries on the Plan Committee and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Iron Mountain and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

**ANSWER:**

Paragraph 36 of the First Amended Complaint contains legal conclusions to which no response is required. Further, Plaintiffs have dismissed their claims against the Board, and no response is required as to the Board. To the extent a response is required, Defendants admit that Iron Mountain is the Plan Sponsor, and appointed members of the Committee. Defendants further admit that the Committee is the Plan Administrator and named fiduciary. Defendants deny any wrongdoing and deny the remaining allegations in Paragraph 36 of the First Amended Complaint.

**COMPLAINT ¶37:**

The Plan is administered by the Plan Committee. As the Plan Administrator, the Plan Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

**ANSWER:**

Paragraph 37 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants admit that the Committee is the Plan Administrator, as defined by ERISA and the Plan document. Defendants deny any

wrongdoing and deny the remaining allegations in Paragraph 37 of the First Amended

Complaint.

## COMPLAINT ¶38:

In 2022, the Plan had $651,327,224 in assets entrusted to the care of the Plan's fiduciaries. As a result, the Plan has the tremendous bargaining power to demand low-cost administrative fees. Defendants, however, did not regularly monitor John Hancock/Fidelity to ensure that John Hancock/Fidelity remained the prudent and objectively reasonable choices to provide Total RKA services.

## ANSWER:

Defendants admit that the Plan's 2022 Form 5500 filing indicates that, as of December

31, 2022, the Plan had Net Assets of $651,327,224. Defendants deny the remaining allegations in

Paragraph 38 of the First Amended Complaint.

## COMPLAINT ¶39:

With 11,474 participants in 2022, the Plan had more participants than 99.86% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year. Similarly, with $651,327,224 in assets in 2022, the Plan had more assets than 99.78% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year.

## ANSWER:

Defendants admit that the Plan's 2022 Form 5500 filing indicates that it had 11,474

participants and net assets of $651,327,224 as of December 31, 2022. Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations regarding

how those figures compare to other defined contribution plans in the United States. Defendants

deny any remaining allegations in Paragraph 39 of the First Amended Complaint.

## ERISA'S FIDUCIARY STANDARDS IN THE
## DEFINED CONTRIBUTION INDUSTRY

## COMPLAINT ¶40:

Employers must: (1) establish a prudent process for selecting service providers and reviewing investments; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers and investments once selected to make sure they continue to be prudent choices.

**ANSWER:**

Paragraph 40 of the First Amended Complaint contains legal conclusions to which no

response is required. To the extent a response is required, Defendants deny any wrongdoing and

deny the remaining allegations in Paragraph 40 of the First Amended Complaint.

**COMPLAINT ¶41:**

Defined contribution plan fiduciaries of very large 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with a prudent and materially identical level and caliber of services. John Hancock and Fidelity are two of the largest of such recordkeepers.

**ANSWER:**

Paragraph 41 of the First Amended Complaint contains legal conclusions to which no

response is required. To the extent a response is required, Defendants deny any wrongdoing and

deny the remaining allegations in Paragraph 41 of the First Amended Complaint.

**COMPLAINT ¶42:**

There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to very large defined contribution plans like the Iron Mountain Plan.

**ANSWER:**

The statements in Paragraph 42 of the First Amended Complaint are generic allegations

that are not specifically directed against Defendants and therefore no response is required. To the

extent a response is required, Defendants deny the remaining allegations in Paragraph 42 of the

First Amended Complaint.

**COMPLAINT ¶43:**

The cost of RKA services depends on the number of participants, not the amount of assets in the participant's account.

312607855v.1

**ANSWER:**

The statements in Paragraph 43 of the First Amended Complaint are generic allegations that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 43 of the First Amended Complaint.

**COMPLAINT ¶44:**

Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

**ANSWER:**

Defendants deny the allegations in Paragraph 44 of the First Amended Complaint.

**COMPLAINT ¶45:**

There are at least three types of RKA services provided by all recordkeepers and other service providers.

**ANSWER:**

The allegations in Paragraph 45 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 45 of the First Amended Complaint.

**COMPLAINT ¶46:**

The first type, "Bundled RKA," may include, but are not limited to:

a.      Recordkeeping;

b.      Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.      Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

      d.      Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

      e.      Maintenance of an employer stock fund;

      f.      Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

      g.      Plan consulting services including assistance in selecting the investments offered to participants;

      h.      Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

      i.      Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

      j.      Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

      k.      Trustee/custodian services.

**ANSWER:**

The allegations in Paragraph 46 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 46 of the First Amended Complaint.

**COMPLAINT ¶47:**

According to the April 22, 2024, Required Disclosure Information for The Iron Mountain Companies 401(k) Plan, "[p]lan administrative fees may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan."

**ANSWER:**

Defendants admit that Plaintiffs cite a written disclosure, which speaks for itself and is the best evidence of its contents. To the extent that the statements in Paragraph 47 of the First

Amended Complaint are inconsistent with or mischaracterize the source document, Defendants deny the allegations.

**COMPLAINT ¶48:**

This is boilerplate language that suggests that John Hancock/Fidelity is not providing anything exceptional, unusual, or customized, about the Bundled RKA services provided to Iron Mountain Plan participants.

**ANSWER:**

Defendants deny the allegations in Paragraph 48 of the First Amended Complaint.

**COMPLAINT ¶49:**

RKA services are necessary for every defined contribution plan. RKA services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

**ANSWER:**

The allegations in Paragraph 49 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants admit that every defined contribution plan, including the Plan, has necessary RKA services. Defendants deny the remaining allegations in Paragraph 49 of the First Amended Complaint.

**COMPLAINT ¶50:**

In other words, the Plan provided participants all the commoditized RKA services provided to all other very large 401(k) plan participant. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by John Hancock/Fidelity and other non-John Hancock/Fidelity service providers. Any differences in RKA services are immaterial to the price quoted by recordkeepers other service providers for such services.

**ANSWER:**

Defendants deny the allegations in Paragraph 50 of the First Amended Complaint.

**COMPLAINT ¶51:**

Bundled RKA services are largely standardized because the RKA providers must provide these services at scale to a large number of plans and must comply with regulatory requirements. They cannot offer customized sets of services to each individual plan.

**ANSWER:**

The allegations in Paragraph 51 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 51 of the First Amended Complaint.

**COMPLAINT ¶52:**

The bulk of the fee paid for Bundled RKA services pays for core services that do not vary from plan to plan.

**ANSWER:**

The allegations in Paragraph 52 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 52 of the First Amended Complaint.

**COMPLAINT ¶53:**

Industry experts have maintained for years that for very large retirement plans like the Iron Mountain Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefi- duciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015.)

**ANSWER:**

The allegations in Paragraph 53 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no

response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 53 of the First Amended Complaint..

**COMPLAINT ¶54:**

Because Bundled RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for very large plans like the Plan.

**ANSWER:**

The allegations in Paragraph 54 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 54 of the First Amended Complaint.

**COMPLAINT ¶55:**

RKA services are essentially fungible and the market for them is highly competitive. This highly competitive RKA market is filled with equally capable recordkeepers and other non-John Hancock/Fidelity service providers, who can provide comparable Bundled RKA services for less if only asked to provide bids to very large plans like the Iron Mountain Plan.

**ANSWER:**

The allegations in Paragraph 55 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 55 of the First Amended Complaint.

**COMPLAINT ¶56:**

Given the very large size of the Iron Mountain Plan, the same price paid by the Iron Mountain Plan for Bundled RKA services to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers over the Class Period, and the trend of price compression for Bundled RKA services over the last six years, it is possible to infer that Defendants did not engage in any competitive solicitation of RKA service bids until it replaced John Hancock with Fidelity in June 2022, and even that process was ineffective given that the Plan continued to pay Fidelity excessive Total RKA fees.

**ANSWER:**

Defendants deny the allegations in Paragraph 56 of the First Amended Complaint.

**COMPLAINT ¶57:**

The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

     a.     Loan processing;

     b.     Brokerage services/account maintenance;

     c.     Distribution services; and

     d.     Processing of Qualified Domestic Relations Orders (QDROs).

**ANSWER:**

The allegations in Paragraph 57 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 57 of the First Amended Complaint.

**COMPLAINT ¶58:**

The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

**ANSWER:**

The allegations in Paragraph 58 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 58 of the First Amended Complaint.

**COMPLAINT ¶59:**

The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the Total RKA fees.

**ANSWER:**

The allegations in Paragraph 59 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 59 of the First Amended Complaint.

**COMPLAINT ¶60:**

Total RKA fee numbers represent the best methodology for determining apples-to-apples comparisons of plans as far as what is being charged to plan participants for Total RKA.

**ANSWER:**

The allegations in Paragraph 60 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 60 of the First Amended Complaint.

**COMPLAINT ¶61:**

It is irrelevant whether John Hancock/Fidelity or other plan service providers receive those fees from Plan participants, as Plan participants are paying for these services out of their individual accounts.

**ANSWER:**

The allegations in Paragraph 61 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 61 of the First Amended Complaint.

**COMPLAINT ¶62:**

The methodology utilized in this Complaint for calculating the Total RKA for both the Iron Mountain Plan and for the comparison plans discussed below contains the following seven steps:

a.   taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

b.   reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) — Schedule of Assets;

c.   reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

d.   Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e.   utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f.   reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether any revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g.   reviewing the results for reasonableness and make revisions as appropriate based on Plaintiff's non-testifying experts experience in evaluating plans at the different recordkeepers.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 of the First Amended Complaint.

**COMPLAINT ¶63:**

Because the Total RKA offerings are fungible among all recordkeepers and other non-service providers who provide services to very large plans, like the Iron Mountain Plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the "revenue requirement" is on a per participant basis for providing the Total RKA services.

**ANSWER:**

The allegations in Paragraph 63 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 63 of the First Amended Complaint.

**COMPLAINT ¶64:**

This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and other service providers and then the summary of the evaluations created by the retirement plan consultants and advisors.

**ANSWER:**

The allegations in Paragraph 64 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 64 of the First Amended Complaint.

**COMPLAINT ¶65:**

Fidelity, the largest 401k recordkeeper in the country, has in fact conceded in another recent case that the Total RKA services that it provides to mega plans are commodified, including the plan services provided to its own employees.

**ANSWER:**

Defendants deny the allegations in Paragraph 65 of the First Amended Complaint.

**COMPLAINT ¶66:**

As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class*

*Period (November 18, 2014 to the present)." See Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

**ANSWER:**

Paragraph 66 of the First Amended Complaint contains generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants admit that Plaintiffs purport to cite a written document, which speaks for itself and is the best evidence of its contents. To the extent that statements in Paragraph 66 of the First Amended Complaint are inconsistent with or mischaracterize the source document, Defendants deny the allegations. Defendants deny any remaining allegation in Paragraph 66 of the First Amended Complaint.

**COMPLAINT ¶67:**

By the start of, and during the entire Class Period, the level of fees that recordkeepers and other service providers have been willing to accept for providing total RKA has stabilized, and has not materially changed for very large plans, including the Iron Mountain Plan.

**ANSWER:**

The allegations in Paragraph 67 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 67 of the First Amended Complaint.

**COMPLAINT ¶68:**

Reasonable total RKA fees paid throughout the Class Period in 2021 are therefore representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

**ANSWER:**

Defendants deny the allegations in Paragraph 68 of the First Amended Complaint.

**COMPLAINT ¶69:**

The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

**ANSWER:**

The allegations in Paragraph 69 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 69 of the First Amended Complaint.

**COMPLAINT ¶70:**

Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

**ANSWER:**

The allegations in Paragraph 70 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 70 of the First Amended Complaint.

**COMPLAINT ¶71:**

The Iron Mountain Plan paid both direct and indirect RKA fees during the Class Period to John Hancock/Fidelity and to other non-John Hancock/Fidelity service providers.

**ANSWER:**

Defendants admit the Plan paid recordkeeping fees to both John Hancock and Fidelity during the Class Period (as it is defined in the First Amended Complaint). Defendants further admit that the Plan paid other fees to John Hancock, Fidelity, and other service providers during the Class Period, and that some of those fees would be included in "RKA fees" as defined in the

First Amended Complaint. Defendants deny the remaining allegations in Paragraph 71 of the

First Amended Complaint.

## COMPLAINT ¶72:

The comparator plans either paid direct and indirect RKA fees or only direct RKA fees, but indirect compensation was taken into consideration for both the Iron Mountain Plan and the comparator plans.

## ANSWER:

Defendants lack knowledge of information sufficient to form a belief as to the truth of the

allegations in Paragraph 72 of the First Amended Complaint.

## COMPLAINT ¶73:

Prudent plan fiduciaries ensure they are paying only reasonable fees for RKA by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.*, U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Give all [retirement plan service providers] complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

## ANSWER:

Paragraph 73 of the First Amended Complaint contains generic allegations and a legal

conclusion to which no response is required. To the extent a response is required, Defendants

admit that Plaintiffs purport to cite written documents, which speak for themselves and are the

best evidence of their contents. To the extent that statements in Paragraph 73 of the First

Amended Complaint are inconsistent with or mischaracterize the source documents, Defendants

deny the allegations. Defendants deny any remaining allegation in Paragraph 73 of the First

Amended Complaint.

**COMPLAINT ¶74:**

Prudent plan fiduciaries can easily receive a quote from other RKA providers to determine if the current level of Total RKA fees is reasonable in light of the level and quality of RKA fees. It is not a cumbersome or expensive process.

**ANSWER:**

Defendants admit that plan fiduciaries can receive quotes from RKA providers to compare RKA fees between recordkeepers. Defendants deny the remaining allegations in Paragraph 74 of the First Amended Complaint.

**COMPLAINT ¶75:**

It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.")

**ANSWER:**

Paragraph 75 of the First Amended Complaint contains generic allegations and a legal conclusion to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs cite a written report, which speaks for itself and is the best evidence of its contents. To the extent that statements in Paragraph 75 of the First Amended Complaint are inconsistent with or mischaracterize the source documents, Defendants deny the allegations. Defendants deny any remaining allegation in Paragraph 75 of the First Amended Complaint.

**COMPLAINT ¶76:**

Having received bids, prudent plan fiduciaries can negotiate with their current RKA providers for a lower fee or move to a new RKA provider to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary.

**ANSWER:**

The allegations in Paragraph 76 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 76 of the First Amended Complaint.

**COMPLAINT ¶77:**

An internal benchmarking survey from CapTrust, Fiduciary Decisions, or similar benchmarking service providers, is inadequate to determine a reasonable Total RKA fee. Such surveys skew to higher "average prices," that favor inflated Total RKA fees. To receive a "reasonable" total RKA fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a periodic basis.

**ANSWER:**

The allegations in Paragraph 77 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 77 of the First Amended Complaint.

**COMPLAINT ¶78:**

Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

**ANSWER:**

Paragraph 78 of the First Amended Complaint contains generic allegations and a legal argument to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs purport to cite case law, which speaks for itself and is the best evidence of its contents. To the extent that statements in Paragraph 78 of the First Amended Complaint are inconsistent with or mischaracterize the source document, Defendants deny the allegations. Defendants deny any remaining allegation in Paragraph 78 of the First Amended Complaint.

**COMPLAINT ¶79:**

First, a hypothetical prudent fiduciary tracks RKA provider's expenses by demanding documents that summarize and contextualize their compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

**ANSWER:**

The allegations in Paragraph 79 of the First Amended Complaint are generic allegations

and statements of opinion that are not specifically directed against Defendants and therefore no

response is required. To the extent a response is required, Defendants deny the allegations in

Paragraph 79 of the First Amended Complaint

**COMPLAINT ¶80:**

Second, to make an informed evaluation as to whether a RKA provider is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's RKA provider.

**ANSWER:**

The allegations in Paragraph 80 of the First Amended Complaint are generic allegations

and statements of opinion that are not specifically directed against Defendants and therefore no

response is required. To the extent a response is required, Defendants deny the allegations in

Paragraph 80 of the First Amended Complaint

**COMPLAINT ¶81:**

Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RKA rates that are available. By soliciting bids from other RKA providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of RKA services.

**ANSWER:**

The allegations in Paragraph 81 of the First Amended Complaint are generic allegations

and statements of opinion that are not specifically directed against Defendants and therefore no

312607855v.1

response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 81 of the First Amended Complaint.

## COMPLAINT ¶82:

Accordingly, the best way to determine the *reasonable*, as opposed to the cheapest or average, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626 (although "a fiduciary *need not constantly solicit quotes* for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and *fail to take action to mitigate excessive fees--such as by* adjusting fee arrangements, *soliciting bids*, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence.") (emphasis added).

## ANSWER:

Paragraph 82 of the First Amended Complaint contains generic allegations and a legal conclusion to which no response is required. To the extent a response is required, Defendants admit that Plaintiffs purport to cite case law, which speaks for itself and is the best evidence of its contents. To the extent that statements in Paragraph 82 of the First Amended Complaint are inconsistent with or mischaracterize the source document, Defendants deny the allegations. Defendants deny any remaining allegation in Paragraph 82 of the First Amended Complaint.

## COMPLAINT ¶83:

A plan fiduciary must monitor its Total RKA fees on an ongoing basis by regularly conducting an independent evaluation of those fees to ensure they are reasonable and remove RKA providers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

## ANSWER:

Paragraph 83 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny any wrongdoing and deny the remaining allegations in Paragraph 83 of the First Amended Complaint.

**COMPLAINT ¶84:**

During the Class Period, Defendants egregiously failed to regularly monitor the Plan's Total RKA fees paid to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers.

**ANSWER:**

Defendants deny the allegations in Paragraph 84 of the First Amended Complaint.

**COMPLAINT ¶85:**

During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from RKA providers, including but not limited to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers, in order to avoid paying unreasonable Total RKA fees.

**ANSWER:**

Defendants deny the allegations in Paragraph 85 of the First Amended Complaint.

**COMPLAINT ¶86:**

During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Total RKA fees it paid to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers, and in light of the level and quality of Total RKA services it received that were materially similar to services available through other RKA providers and provided to other very large plans.

**ANSWER:**

Defendants deny the allegations in Paragraph 86 of the First Amended Complaint.

**COMPLAINT ¶87:**

As set forth in the table below, from the years 2018 through 2023, based upon information provided in 5500 Forms filed with the Department of Labor (DOL) and in participant quarterly account statements, the Plan paid an effective average annual total RKA fee of $100 per participant.

### Total Recordkeeping and Administration (Total RKA) Fees

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Average |
|---|---|---|---|---|---|---|---|
| Participants | 12,524 | 12,192 | 12,088 | 12,372 | 11,474 | 11,474 | *12,021* |
| Est. Total RKA Fees | $655,804 | $856,019 | $879,984 | $1,883,723 | $2,121,585 | $803,180 | *$1,200,049* |
| Est. Total RKA Per Participant | $52 | $70 | $73 | $152 | $185 | $70 | *$100* |
| Reliable Est. of Reasonable Total RKA Fees | $413,292 | $402,336 | $398,904 | $408,276 | $378,642 | $378,642 | *$396,682* |
| Reliable Est. of Reasonable Total RKA Fees Per PP | $33 | $33 | $33 | $33 | $33 | $33 | *$33* |

**ANSWER:**

Defendants deny the allegations in Paragraph 87 of the First Amended Complaint.

**COMPLAINT ¶88:**

The table below illustrates the annual Total RKA fees paid by other similarly sized, comparable plans, receiving a materially similar level and quality of Total RKA services, compared to the average annual Total RKA fees paid by the Plan (as identified in the table above).

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2021 Form 5500 information or the most recent Form 5500 if 2021 is not available)

| Plan | Partici-pants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| ADM 401K and Employee Stock Owner-ship Plan for Salaried Employees | 10,308 | $413,157 | $40 | Fidelity |
| Operating Engineers Local 66 Annuity and Savings Fund | 10,486 | $305,305 | $29 | John Han-cock/Fidelity |
| Thoroughbred Retirement Investment Plan of Norfolk Southern Corporation and Participating Subsidiary Companies | 12,296 | $589,386 | $48 | Vanguard |
| SkyWest, Inc. Employees' Retirement Plan | 12,298 | $507,665 | $41 | Schwab |
| **IRON Mountain Plan 2021 Fee** | **12,372** | **$1,883,723** | **$152** | **John Han-cock/Fidelity** |
| Fortive Retirement Savings Plan | 12,758 | $429,890 | $34 | Fidelity |
| Sutter Health Retirement Income Plan | 13,824 | $276,872 | $20 | Fidelity |

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88 of the First Amended Complaint.

**COMPLAINT ¶89:**

To determine the Total RKA fees that other comparable plans are paying, Plaintiffs considered both the direct and indirect compensation collected as disclosed on publicly available Form 5500s.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89 of the First Amended Complaint.

312607855v.1

**COMPLAINT ¶90:**

To ensure meaningful, apples-to-apples comparisons, Plaintiffs utilized the same methodology to compare the fees of the Plan with the fees of other similarly situated and comparable plans.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90 of the First Amended Complaint.

**COMPLAINT ¶91:**

The direct compensation paid by the plans to their recordkeepers is derived from Item 2 of Part 1 of Schedule C.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91 of the First Amended Complaint.

**COMPLAINT ¶92:**

In some cases, the comparable plans disclose that their recordkeepers do not receive any indirect compensation. In those cases, therefore, the direct compensation represents the full amount of compensation paid by the plans to the recordkeeper.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92 of the First Amended Complaint.

**COMPLAINT ¶93:**

When the plans disclose that they did receive indirect compensation, the amount of indirect compensation is derived from multiplying the revenue sharing/pricing credit rates for each investment option times the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93 of the First Amended Complaint.

312607855v.1

**COMPLAINT ¶94:**

The revenue sharing rates/pricing credit rates are either disclosed on Item 3 of Part 1 of Schedule C or are commonly known in the industry and are also publicly available and provided by recordkeepers and their custodians.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 of the First Amended Complaint.

**COMPLAINT ¶95:**

Additionally, in some cases, the notes to the Financial Statements filed by the plan fiduciaries as attachments to Form 5500 provide information related to pricing credits and other revenue sharing credits that may serve to reduce the RKA fees paid by the plan.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 of the First Amended Complaint.

**COMPLAINT ¶96:**

The Plan's Total RKA fee rate range of $52/pp to $185/pp throughout the relevant period can be compared to the much lower Total RKA fee rate of other comparable plans, when available.

**ANSWER:**

Defendants deny the allegations in Paragraph 96 of the First Amended Complaint.

**COMPLAINT ¶97:**

Each of the meaningfully comparable plans identified below is among the closest 5/100th of 1% (0.05%) of all the defined contribution plans covered by ERISA.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 of the First Amended Complaint.

**COMPLAINT ¶98:**

There were around 690,128 plans in 2021 and only 3,516 plans had between 10,308 and 13,824 participants with a balance greater than zero at year-end. Therefore, 686,612 plans or 99.95% of all plans have either less than 10,308 or more than 13,824 participants.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 98 of the First Amended Complaint.

**COMPLAINT ¶99:**

Plans containing between 10,308 and 13,824 participants are among the most meaningful and appropriate to use as similarly situated comparable plans and are superior to the remaining 99.95% of all the defined contribution plans governed by ERISA in 2021.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 99 of the First Amended Complaint.

**COMPLAINT ¶100:**

**ADM 401K and Employee Stock Ownership Plan For Salaried Employees** ("ADM"): The reliable estimate of $40/pp is comprised of $40/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 100 of the First Amended Complaint.

**COMPLAINT ¶101:**

The ADM Plan is a meaningful benchmark because at the end of 2021 the ADM plan had around 10,308 participants, slightly less than the 12,372 participants in the Plan at the end of 2021. As noted above, the ADM Plan is among the closest 0.05% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the ADM Plan and

the Plan and any service differentials cannot explain the disparity between the fees paid by the ADM plan and the fees paid by the Plan.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 101 of the First Amended Complaint.

**COMPLAINT ¶102:**

For example, the 2021 disparity of $112/pp between the $40/pp Total RKA rate for the ADM Plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,380,000 annually and would conservatively represent more than 27,600 hours of RKA services in one year provided by employees of the recordkeeper.

**ANSWER:**

Defendants deny the allegations in Paragraph 102 of the First Amended Complaint.

**COMPLAINT ¶103:**

If at the end of 2021 the ADM Plan can obtain a Total RKA fee of $40/pp with 10,308 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $40/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

**ANSWER:**

Defendants deny the allegations in Paragraph 103 of the First Amended Complaint.

**COMPLAINT ¶104:**

**Operating Engineers Local 66 Annuity and Savings Fund** ("Operating Engineers"): The reliable estimate of $29/pp is comprised of $29/pp of direct compensation paid to John Hancock/Fidelity from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 104 of the First Amended Complaint.

**COMPLAINT ¶105:**

The Operating Engineers Plan is a meaningful benchmark because at the end of 2021 the Operating Engineers Plan had around 10,486 participants, slightly less than the 12,372 participants in the Plan at the end of 2021. As noted above, the Operating Engineers plan is among the closest 0.05% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Operating Engineers Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Operating Engineers Plan and the fees paid by the Plan.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 105 of the First Amended Complaint.

**COMPLAINT ¶106:**

For example, the 2021 disparity of $123/pp between the $29/pp Total RKA rate for the Operating Engineers Plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,520,000 annually and would conservatively represent more than 30,400 hours of RKA services in one year provided by employees of the recordkeeper.

**ANSWER:**

Defendants deny the allegations in Paragraph 106 of the First Amended Complaint.

**COMPLAINT ¶107:**

If at the end of 2021 the Operating Engineers Plan can obtain a Total RKA fee of $29/pp with 10,486 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $29/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

**ANSWER:**

Defendants deny the allegations in Paragraph 107 of the First Amended Complaint.

**COMPLAINT ¶108:**

**Thoroughbred Retirement Investment Plan of Norfolk Southern Corporation and Participating Subsidiary Companies** ("Norfolk"): The reliable estimate of $48/pp is comprised of $48/pp of direct compensation paid to Vanguard from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on

the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 of the First Amended Complaint.

**COMPLAINT ¶109:**

The Norfolk Plan is a meaningful benchmark because at the end of 2021 the Norfolk plan had around 12,296 participants, slightly less than the 12,372 participants in the Plan at the end of 2021. As noted above, the Norfolk plan is among the closest 0.05% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Norfolk plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Norfolk plan and the fees paid by the Plan.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109 of the First Amended Complaint.

**COMPLAINT ¶110:**

For example, the 2021 disparity of $104/pp between the $48/pp Total RKA rate for the Norfolk Plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,290,000 annually and would conservatively represent more than 25,800 hours of RKA services in one year provided by employees of the recordkeeper.

**ANSWER:**

Defendants deny the allegations in Paragraph 95 of the First Amended Complaint.

**COMPLAINT ¶111:**

If at the end of 2021 the Norfolk Plan can obtain a Total RKA fee of $48/pp with 12,296 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $48/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

**ANSWER:**

Defendants deny the allegations in Paragraph 111 of the First Amended Complaint.

**COMPLAINT ¶112:**

**SkyWest, Inc. Employees' Retirement Plan** ("SkyWest"): The reliable estimate of $41/pp is comprised of $41/pp of direct compensation paid to Schwab from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 112 of the First Amended Complaint.

**COMPLAINT ¶113:**

The SkyWest Plan is a meaningful benchmark because at the end of 2021 the Sky-West Plan had around 12,298 participants, slightly less than the 12,372 participants in the Plan at the end of 2021. As noted above, the SkyWest Plan is among the closest 0.05% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the SkyWest Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the SkyWest plan and the fees paid by the Plan.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 113 of the First Amended Complaint.

**COMPLAINT ¶114:**

For example, the 2021 disparity of $111/pp between the $41/pp Total RKA rate for the SkyWest plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,370,000 annually and would conservatively represent more than 27,400 hours of RKA services in one year provided by employees of the recordkeeper.

**ANSWER:**

Defendants deny the allegations in Paragraph 114 of the First Amended Complaint.

**COMPLAINT ¶115:**

If at the end of 2021 the SkyWest Plan can obtain a Total RKA fee of $41/pp with 12,298 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a

Total RKA fee of around $41/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

**ANSWER:**

Defendants deny the allegations in Paragraph 115 of the First Amended Complaint.

**COMPLAINT ¶116:**

**Fortive Retirement Savings Plan** ("Fortive"): The reliable estimate of $34/pp is comprised of $34/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116 of the First Amended Complaint.

**COMPLAINT ¶117:**

The Fortive Plan is a meaningful benchmark because at the end of 2021 the Fortive plan had around 12,758 participants, slightly more than the 12,372 participants in the Plan at the end of 2021. As noted above, the Fortive Plan is among the closest 0.05% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Fortive Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Fortive Plan and the fees paid by the Plan.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117 of the First Amended Complaint.

**COMPLAINT ¶118:**

For example, the 2021 disparity of $119/pp between the $34/pp Total RKA rate for the Fortive plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,460,000 annually and would conservatively represent more than 29,200 hours of RKA services in one year provided by employees of the recordkeeper.

**ANSWER:**

Defendants deny the allegations in Paragraph 118 of the First Amended Complaint.

**COMPLAINT ¶119:**

If at the end of 2021 the Fortive Plan can obtain a Total RKA fee of $34/pp with 12,758 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $34/pp.

**ANSWER:**

Defendants deny the allegations in Paragraph 119 of the First Amended Complaint.

**COMPLAINT ¶120:**

**Sutter Health Retirement Income Plan** ("Sutter"): The reliable estimate of $20/pp is comprised of $20/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and, to the extent that the recordkeeper received indirect compensation, a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times either the disclosed revenue sharing rates and pricing credits or rates provided by recordkeepers, which are publicly available.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 120 of the First Amended Complaint.

**COMPLAINT ¶121:**

The Sutter Plan is a meaningful benchmark because at the end of 2021 the Sutter Plan had around 13,824 participants, slightly more than the 12,372 participants in the Plan at the end of 2021. As noted above, the Sutter Plan is among the closest 0.05% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 2,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Sutter Plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Sutter Plan and the fees paid by the Plan.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 121 of the First Amended Complaint.

**COMPLAINT ¶122:**

For example, the 2021 disparity of $132/pp between the $20/pp Total RKA rate for the Sutter Plan's fee compared to the Total RKA effective rate of $152/pp paid by the Plan represents over $1,630,000 annually and would conservatively represent more than 32,600 hours of RKA services in one year provided by employees of the recordkeeper.

**ANSWER:**

Defendants deny the allegations in Paragraph 122 of the First Amended Complaint.

**COMPLAINT ¶123:**

If at the end of 2021 the Sutter Plan can obtain a Total RKA fee of $20/pp with 13,824 participants, then the Plan, with 12,372 participants at the end of 2021, should be able to obtain a Total RKA fee of around $20/pp.

**ANSWER:**

Defendants deny the allegations in Paragraph 123 of the First Amended Complaint.

**COMPLAINT ¶124:**

Viewing all the data points provided by the comparable plans set forth above holistically and in the full context of how the retirement plan industry operates supports a reasonable inference that the Plan paid unreasonable and excessive fees for Total RKA services.

**ANSWER:**

Defendants deny the allegations in Paragraph 124 of the First Amended Complaint.

**COMPLAINT ¶125:**

The market for RKA services is not transparent. Recordkeepers do not provide transparency related to the fees they charge all their clients, nor do they provide transparency related to the bids they provided throughout the Class Period for other plans with a similar number of participants as the Plan.

**ANSWER:**

The allegations in Paragraph 125 of the First Amended Complaint are generic allegations and statements of opinion that are not specifically directed against Defendants and therefore no response is required. To the extent a response is required, Defendants admit the allegations in Paragraph 125 of the First Amended Complaint.

**COMPLAINT ¶126:**

Recordkeepers are able to negotiate at arm's length with plan fiduciaries and will accept higher fees from plan fiduciaries who are unaware of the reasonable market rate through, for example, failing to solicit competitive bids, among other reasons.

**ANSWER:**

The allegations in Paragraph 126 of the First Amended Complaint are generic allegations

and statements of opinion that are not specifically directed against Defendants and therefore no

response is required. To the extent a response is required, Defendants lack knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 126 of the

First Amended Complaint.

**COMPLAINT ¶127:**

Due to the lack of transparency, the primary and most significant driver of the disparity between the actual RKA fees paid by plans with similar numbers of participants greater than around 2,000 is the actual practices of the plans' fiduciaries.

**ANSWER:**

The allegations in Paragraph 127 of the First Amended Complaint are generic allegations

and statements of opinion that are not specifically directed against Defendants and therefore no

response is required. To the extent a response is required, Defendants deny the allegations in

Paragraph 127 of the First Amended Complaint

**COMPLAINT ¶128:**

The most plausible explanation of the disparity of between $20/pp and $48/pp from the comparable plans and the Plan is that the Plan's fiduciaries engaged in imprudent conduct.

**ANSWER:**

Defendants deny the allegations in Paragraph 128 of the First Amended Complaint.

**COMPLAINT ¶129:**

The disparity between the fee rates of the comparable plans, based on the amount of participants in each of the plans, and the reasonable rate, based on the trend line created by the comparable plans fee rates, is less than $28 per participant and is most plausibly explained by

minor variations in negotiation tactics and circumstances among the fiduciaries of the comparable plans and the various recordkeepers.

**ANSWER:**

Defendants deny the allegations in Paragraph 129 of the First Amended Complaint.

**COMPLAINT ¶130:**

This lack of disparity in the comparable plans is in stark contrast to the disparity of $72 per participant paid by the Plan compared to the reliable estimate of a reasonable Total RKA fee rate for a plan with 12,130 participants of around $33 per participant per year.

**ANSWER:**

Defendants deny the allegations in Paragraph 130 of the First Amended Complaint.

**COMPLAINT ¶131:**

The amount of assets in a plan has little to no impact on the costs to the record-keeper, so any differences in the amount of assets in the comparable plans compared to the Plan has no impact on whether the comparable plans make meaningful benchmarks.

**ANSWER:**

Defendants deny the allegations in Paragraph 131 of the First Amended Complaint.

**COMPLAINT ¶132:**

The comparator plans serviced by other recordkeepers and who charged less received materially the same level and quality of total RKA services given that these services are fungible and commodified for very large plans like the Iron Mountain Plan. Indeed, each of these plans note in their fee disclosures and other Plan documents that they received RKA services materially similar to the Iron Mountain Plan in the form of recordkeeping, trustee, accounting, and other administrative services.

**ANSWER:**

Defendants deny the allegations in Paragraph 132 of the First Amended Complaint.

**COMPLAINT ¶133:**

Although some of the comparator utilize different service or compensation codes for the services received on the 5500 Form, the fact remains the Total RKA fees are fungible and commoditized and any differences between the plans in these codes are immaterial from a pricing perspective.

**ANSWER:**

Defendants deny the allegations in Paragraph 133 of the First Amended Complaint.

**COMPLAINT ¶134:**

The graph below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes, receiving a materially similar level and quality of RKA services in 2021, compared to the 2021 Total RKA fees paid by the Iron Mountain Plan, with the white data points representing Total RKA fees paid by comparable plans.



**ANSWER:**

Defendants deny the allegations in Paragraph 134 of the First Amended Complaint.

**COMPLAINT ¶135:**

The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several RKA service providers serving the mega market would be willing to accept in a competitive environment to provide total RKA services to the Iron Mountain Plan.

**ANSWER:**

Defendants deny the allegations in Paragraph 135 of the First Amended Complaint.

**COMPLAINT ¶136:**

For the 2021 Plan year, the table above illustrates that the Plan paid an effective average annual total RKA fee of $152 per participant.

**ANSWER:**

Defendants deny the allegations in Paragraph 136 of the First Amended Complaint.

**COMPLAINT ¶137:**

A reasonable Total RKA fee for the Iron Mountain Plan in 2021 based on the services provided by existing RKA service providers and the Plan's features, based on graph and charts above, would have been $33 per participant.

**ANSWER:**

Defendants deny the allegations in Paragraph 137 of the First Amended Complaint.

**COMPLAINT ¶138:**

The Total RKA fees paid by the Plan to John Hancock/Fidelity and other non-John Hancock/Fidelity service providers during 2018-2023 were also excessive relative to the RKA services rendered. More specifically, a disparity of $67 per participant (over 203% premium) for materially similar Total RKA services existed during the Class Period.

**ANSWER:**

Defendants deny the allegations in Paragraph 138 of the First Amended Complaint.

**COMPLAINT ¶139:**

From the years 2018 through 2023 and based upon information derived from the Plan 5500 Forms in similarly sized plans and from participant quarterly account statements, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $1,200,049 per year in Total RKA fees, which equated to an effective average of approximately $100 per participant per year.

**ANSWER:**

Defendants deny the allegations in Paragraph 139 of the First Amended Complaint.

**COMPLAINT ¶140:**

From the years 2018 through 2023, and based upon information derived from the Plan 5500 Forms in similarly sized plans and from participant quarterly account statements, as compared to other plans of similar sizes receiving a materially similar level and quality of Total RKA services, had Defendants been acting prudently, the Plan actually would have paid on

average a reasonable effective annual market rate for total RKA of approximately $396,682 per year, which equates to approximately $33 per participant per year.

**ANSWER:**

Defendants deny the allegations in Paragraph 140 of the First Amended Complaint.

**COMPLAINT ¶141:**

During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *a 203% premium* for what they could otherwise pay for the materially similar level and quality of Total RKA services.

**ANSWER:**

Paragraph 141 of the First Amended Complaint contains legal conclusions to which no

responses is required. To the extent a response is required, Defendants deny any wrongdoing;

deny that Plaintiffs, the Plan, or the putative class are entitled to any relief; and deny the

remaining allegations in Paragraph 141 of the First Amended Complaint.

**COMPLAINT ¶142:**

From the years 2018 through 2023 and based upon information derived from the Plan 5500 Forms, the Plan additionally cost its participants on average approximately $803,367 per year in unreasonable and excessive Total RKA fees, which equates to, on average, approximately $67 per participant per year.

**ANSWER:**

Defendants deny the allegations in Paragraph 142 of the First Amended Complaint.

**COMPLAINT ¶143:**

From the years 2018 to 2023, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of Total RKA services, the Plan actually cost its participants a total minimum amount of approximately $4,820,203 in unreasonable and excessive Total RK&A fees.

**ANSWER:**

Defendants deny the allegations in Paragraph 143 of the First Amended Complaint.

**COMPLAINT ¶144:**

From the years 2018 to 2023, based upon information derived from the Plan 5500 Forms and from participant quarterly account statements, because Defendants did not act prudently, and as compared to other plans of similar sizes and with a materially similar level and quality of services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $5,567,571 in Total RKA fees.

**ANSWER:**

Defendants deny the allegations in Paragraph 144 of the First Amended Complaint.

**COMPLAINT ¶145:**

Defendants could have received Total RKA services during the Class Period of the same level and quality from John Hancock/Fidelity and other non-John Hancock/Fidelity service providers that provide RKA services to very large plans, like the Iron Mountain plan, because the Plan 5500 Forms establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above.

**ANSWER:**

Defendants deny the allegations in Paragraph 145 of the First Amended Complaint.

**COMPLAINT ¶146:**

Defendants failed to take advantage of the Plan's substantial size to timely negotiate lower fees from John Hancock/Fidelity and other non-John Hancock/Fidelity service providers.

**ANSWER:**

Defendants deny the allegations in Paragraph 146 of the First Amended Complaint.

**COMPLAINT ¶147:**

Defendants could have obtained the materially same Total RKA services for less from other RKA providers or from John Hancock/Fidelity and other existing non-John Hancock/Fidelity service providers had the Plan only leveraged its substantial size on the RKA provider marketplace in a more timely and prudent manner.

**ANSWER:**

Defendants deny the allegations in Paragraph 147 of the First Amended Complaint.

**COMPLAINT ¶148:**

Defendants did not conduct effective or competitive bidding for Total RKA services during the Class Period and failed to use the Plan's substantial size to negotiate rebates from John Hancock/Fidelity and the non-John Hancock/Fidelity service providers.

**ANSWER:**

Defendants deny the allegations in Paragraph 148 of the First Amended Complaint.

**COMPLAINT ¶149:**

Plaintiffs and Class Members paid these excessive Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

**ANSWER:**

Defendants deny the allegations in Paragraph 149 of the First Amended Complaint.

**COMPLAINT ¶150:**

During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Total RKA fees it paid to John Hancock/Fidelity and the non-John Hancock/Fidelity service providers, it would have realized that the Plan was compensating John Hancock/Fidelity and the non-John Hancock/Fidelity service providers unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and other Plan participants.

**ANSWER:**

Defendants deny the allegations in Paragraph 150 of the First Amended Complaint.

**COMPLAINT ¶151:**

Defendants should have removed John Hancock/Fidelity and the non-John Hancock/Fidelity service providers as Plan RKA providers during the Class Period. Instead, it kept John Hancock/Fidelity and the non-John Hancock/Fidelity service providers at these inflated total RKA fee prices.

**ANSWER:**

Defendants deny the allegations in Paragraph 151 of the First Amended Complaint.

**COMPLAINT ¶152:**

During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total RKA fees than they should have been and/or by failing to take effective and timely remedial actions including removing John

Hancock/Fidelity and the non-John Hancock/Fidelity service providers as the Plan RKA providers, Defendants breached their fiduciary duty of prudence to Plaintiffs and to other Plan participants, causing millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

**ANSWER:**

Defendants deny the allegations in Paragraph 152 of the First Amended Complaint.

## CLASS ACTION ALLEGATIONS

**COMPLAINT ¶153:**

29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action in a representative capacity on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

**ANSWER:**

Paragraph 153 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a responses is required, Defendants deny the allegations in Paragraph 153 of the First Amended Complaint.

**COMPLAINT ¶154:**

In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the Iron Mountain 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 7, 2018, and running through the date of judgment.

**ANSWER:**

Defendants admit that Plaintiffs seek to bring this action as representatives of a class of all participants and beneficiaries of the Plan. Defendants deny any remaining allegations in Paragraph 154 of the First Amended Complaint, deny any wrongdoing and deny that Plaintiffs, the Plan, or the putative class are entitled to any relief.

**COMPLAINT ¶155:**

The Class includes near to 12,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

**ANSWER:**

Paragraph 155 of the First Amended Complaint contains legal conclusions to which no

response is required. To the extent a response is required, Defendants deny the allegations in

Paragraph 155 of the First Amended Complaint.

**COMPLAINT ¶156:**

There are questions of law and fact common to the two combined Subclasses pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

   a.   Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

   b.   Whether Defendants breached their fiduciary duties to the Plan;

   c.   What are the losses to the Plan resulting from each breach of fiduciary duty; and

   d.   What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

**ANSWER:**

Paragraph 156 of the First Amended Complaint contains legal conclusions to which no

response is required. To the extent a response is required, Defendants deny the allegations in

Paragraph 156 of the First Amended Complaint.

**COMPLAINT ¶157:**

Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

**ANSWER:**

Paragraph 157 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 157 of the First Amended Complaint.

**COMPLAINT ¶158:**

Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

**ANSWER:**

Defendants deny the allegations in Paragraph 158 of the First Amended Complaint.

**COMPLAINT ¶159:**

Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

**ANSWER:**

Paragraph 159 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 159 of the First Amended Complaint.

**COMPLAINT ¶160:**

Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the subclasses as a whole.

**ANSWER:**

Paragraph 160 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 160 of the First Amended Complaint.

**COMPLAINT ¶161:**

Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

**ANSWER:**

The allegations in Paragraph 161 of the First Amended Complaint are generic allegations that are not specifically directed against Defendants, are statements of opinion, and are legal conclusions and therefore no response is required. To the extent a response is required, Defendants deny class certification is appropriate in this case.

**COMPLAINT ¶162:**

The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

**ANSWER:**

Defendants deny the allegations in Paragraph 162 of the First Amended Complaint

**COMPLAINT ¶163:**

The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

**ANSWER:**

Paragraph 163 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 163 of the First Amended Complaint

**COMPLAINT ¶164:**

Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation — such as a requirement to exhaust administrative remedies — does not, by itself, bind the Plan.

**ANSWER:**

Paragraph 164 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 164 of the First Amended Complaint.

**COMPLAINT ¶165:**

Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances — that the Court should review and where appropriate defer to a Plan administrator's decision — does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**ANSWER:**

Paragraph 165 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 165 of the First Amended Complaint

## FIRST CLAIM FOR RELIEF

**Breach of Duty of Prudence of ERISA, as Amended
(Plaintiff, on behalf of themselves and Class, Against
Defendant Plan Committee — Total RKA Fees)**

**COMPLAINT ¶166:**

Plaintiffs restate the above allegations as if fully set forth herein.

**ANSWER:**

Defendants restate and incorporate by reference their responses in the preceding paragraphs as though fully set forth herein.

312607855v.1

**COMPLAINT ¶167:**

Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

**ANSWER:**

Paragraph 167 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants admit the Committee is a fiduciary with respect to certain activities. Defendants deny any remaining allegations in Paragraph 167 of the First Amended Complaint.

**COMPLAINT ¶168:**

29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

**ANSWER:**

Paragraph 168 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations in Paragraph 168 of the First Amended Complaint.

**COMPLAINT ¶169:**

Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting RKA providers that charge objectively reasonable Total RKA fees.

**ANSWER:**

Paragraph 169 of the First Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 169 of the First Amended Complaint.

**COMPLAINT ¶170:**

During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's Total RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

**ANSWER:**

Defendants admit that the Committee had certain duties with respect to the Plan as set forth in the documents and instruments governing the Plan. Defendants further admit that ERISA imposes certain responsibilities on fiduciaries with respect to the performance of fiduciary functions. Defendants deny the remaining allegations in Paragraph 170 of the First Amended Complaint.

**COMPLAINT ¶171:**

During the Class Period, Defendant Plan Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's Total RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

**ANSWER:**

Defendants deny the allegations in Paragraph 171 of the First Amended Complaint.

**COMPLAINT ¶172:**

During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's RKA providers, John Hancock/Fidelity and the non-John Hancock/Fidelity service providers, to make sure they were providing the Total RKA services at reasonable costs, given the highly competitive, commodified market surrounding RKA services and the enormous bargaining power the Plan had to negotiate the best fees, and remove John Han-cock/Fidelity and the other non-John Hancock/Fidelity service providers if they provided RKA services at objectively unreasonable fee levels.

**ANSWER:**

Defendants admit that ERISA imposes certain responsibilities on fiduciaries with respect to the performance of fiduciary functions. Defendants admit that ERISA speaks for itself and is the best evidence of its content and meaning. Defendants deny any remaining allegations in Paragraph 172 of the First Amended Complaint.

**COMPLAINT ¶173:**

During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to

evaluate the cost of the Plan's RKA services critically or objectively in comparison to other RKA provider options.

**ANSWER:**

Defendants deny the allegations in Paragraph 173 of the First Amended Complaint.

**COMPLAINT ¶174:**

Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

**ANSWER:**

Defendants deny the allegations in Paragraph 174 of the First Amended Complaint.

**COMPLAINT ¶175:**

As a result of Defendant Plan Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

**ANSWER:**

Defendants deny the allegations in Paragraph 175 of the First Amended Complaint.

**COMPLAINT ¶176:**

Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Iron Mountain Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, the Defendant Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

**ANSWER:**

Defendants deny the allegations in Paragraph 176 of the First Amended Complaint.

## SECOND CLAIM FOR RELIEF

**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiffs, on behalf of themselves and Class, Against
Defendants Iron Mountain and Board — Total RKA Fees)**

### COMPLAINT ¶177:

Plaintiffs restate the above allegations as if fully set forth herein.

### ANSWER:

Defendants restate and incorporate their responses in the preceding paragraphs as though

fully set forth herein.

### COMPLAINT ¶178:

Defendants Iron Mountain and Board had the authority to appoint and remove members
or individuals responsible for Plan Total RKA fees on the Plan Committee and knew or should
have known that these fiduciaries had critical responsibilities for the Plan.

### ANSWER:

Plaintiffs dismissed their claims against the Board. Accordingly, no response to the

allegations regarding the Board in Paragraph 178 of the First Amended Complaint is required.

Defendants admit Iron Mountain had authority to appoint and remove members of the

Committee. Defendants deny any wrongdoing and deny that Plaintiffs, the Plan, or the putative

class are entitled to any relief. Defendants deny the remaining allegations in Paragraph 178 of the

First Amended Complaint

### COMPLAINT ¶179:

In light of this authority, Defendants Iron Mountain and Board had a duty to monitor
those individuals responsible for Plan Total RKA fees on the Plan Committee to ensure that they
were adequately performing their fiduciary obligations, and to take prompt and effective action
to protect the Plan in the event that these individuals were not fulfilling those duties.

### ANSWER:

Plaintiffs dismissed their claims against the Board. Accordingly, no response to the

allegations regarding the Board in Paragraph 179 of the First Amended Complaint is required.

The remaining allegations in Paragraph 179 of the First Amended Complaint contains legal

conclusions to which no response is required. To the extent a response is required, Defendants

deny the allegations in Paragraph 179 of the First Amended Complaint.

### COMPLAINT ¶180:

Defendants Iron Mountain and Board had a duty to ensure that the individuals responsible for Plan Total RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Total RKA fees; and reported regularly to Defendants Iron Mountain and Board.

### ANSWER:

Plaintiffs dismissed their claims against the Board. Accordingly, no response to the

allegations regarding the Board in Paragraph 180 of the First Amended Complaint is required.

The remaining allegations in Paragraph 180 of the First Amended Complaint contains legal

conclusions to which no response is required. To the extent a response is required, Defendants

deny the allegations in Paragraph 180 of the First Amended Complaint.

### COMPLAINT ¶181:

The objectively unreasonable and excessive Total RKA fees paid by the Plan inferentially establish that Defendants Iron Mountain and Board breached their duty to monitor by, among other things:

a.  Failing to monitor and evaluate the performance of individuals responsible for Plan Total RKA fees on the Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably Total RKA expenses;

b.  Failing to monitor the process by which the Plan's RKA providers, John Hancock/Fidelity and the other non-John Hancock/Fidelity service providers, were evaluated and failing to investigate the availability of more reasonably-priced RKA providers; and

c.  Failing to remove individuals responsible for Plan Total RKA fees on the Plan Committee whose performance was inadequate in that these individuals continued to pay the same Total RKA costs over numerous years even though solicitation of competitive bids would have shown that maintaining John Hancock/Fidelity and

the other non-John Hancock/Fidelity service providers as the RKA providers at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiffs' and other Plan participants' retirement savings.

**ANSWER:**

Plaintiffs dismissed their claims against the Board. Accordingly, no response to the allegations regarding the Board in Paragraph 181 of the First Amended Complaint is required.

Defendants deny the remaining allegations in Paragraph 181 of the First Amended Complaint.

**COMPLAINT ¶182:**

As the consequences of the breaches of the duty to monitor for Total RKA fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

**ANSWER:**

Plaintiffs dismissed their claims against the Board. Accordingly, no response to the allegations regarding the Board in Paragraph 182 of the First Amended Complaint is required.

Defendants deny the remaining allegations in Paragraph 182 of the First Amended Complaint

**COMPLAINT ¶183:**

Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Iron Mountain and Board are liable to restore to the Iron Mountain Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Total RKA fees on the Plan Committee. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**ANSWER:**

Plaintiffs dismissed their claims against the Board. Accordingly, no response to the allegations regarding the Board in Paragraph 183 of the First Amended Complaint is required.

Defendants deny the allegations in Paragraph 183 of the First Amended Complaint.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D.      An Order compelling Defendants to make good to Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to Plan all losses resulting from paying unreasonable Total RKA fees, and restoring to Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An Order requiring Iron Mountain to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Iron Mountain as necessary to effectuate relief, and to prevent Iron Mountain' unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest at no less than the Massachusetts statutory rate of 12% simple interest per annum;

L       An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

## ANSWER:

The foregoing contains a Prayer for Relief, to which no response is required. To the extent a response is required, Defendants deny the allegations in the Prayer for Relief, and deny Plaintiffs, the Plan or the putative class are entitled to any relief whatsoever.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming the burden of proof on any matters that would otherwise rest with Plaintiffs and the putative class, and expressly denying all wrongdoing, Defendants allege the following additional defenses:

### FIRST DEFENSE

Plaintiffs fail to state a claim upon which relief may be granted.

### SECOND DEFENSE

Plaintiffs' claims are barred by the applicable statute of limitations or repose.

### THIRD DEFENSE

To the extent that Plaintiffs' claims are premised on the fiduciary status of the Defendants, these claims are barred against all Defendants who are not fiduciaries of the Plan or were not fiduciaries for purposes of the claims alleged.

### FOURTH DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or in part, by ERISA Section 409(b), 29 U.S.C. § 1109(b).

### FIFTH DEFENSE

Any losses alleged by Plaintiffs were not caused by any alleged breach of fiduciary duty by Defendants, as set forth in ERISA Section 409(a), 29 U.S.C. § 1109(a) and elsewhere, but resulted from economic causes and events not related to any alleged breaches of fiduciary duty and from matters over which Defendants had no control.

### SIXTH DEFENSE

To the extent Plaintiffs have stated a claim on which relief may be granted, Plaintiffs have proximately caused, contributed to, or failed to mitigate any and all losses that they claim.

### SEVENTH DEFENSE

Plaintiffs and the Class members lack Article III standing to sue to the extent that they have not sustained any injuries, damages, or loss by reason of any of Defendants' acts.

63

**EIGHTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the applicable principles of waiver, laches, and/or estoppel.

**NINTH DEFENSE**

The claims of any Plaintiff or Class member who has executed a waiver or release of claims against any or all of the Defendants are barred.

**TENTH DEFENSE**

Those Defendants with fiduciary obligations to the Plan engaged in a prudent process in fulfilling their fiduciary duties to the Plan.

**ELEVENTH DEFENSE**

Those Defendants with fiduciary obligations to the Plan did not breach their fiduciary duties because the fees associated with the Plan were reasonable and were properly disclosed.

**TWELFTH DEFENSE**

Plaintiffs are not entitled to proceed on behalf of all Plan participants nor are they entitled to certification of this action as a class action because they cannot satisfy the requirements of Federal Rule of Civil Procedure 23.

DATED: July 23, 2024

Respectfully submitted,

IRON MOUNTAIN INCORPORATED and
RETIREMENT PLAN COMMITTEE OF
IRON MOUNTAIN INCORPORATED,


/s/ Ian H. Morrison

Michael E. Steinberg
msteinberg@seyfarth.com
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, Massachusetts  02210-2028
Telephone:  (617) 946-4800
Facsimile:   (617) 946-4801

SEYFARTH SHAW LLP
Ian H. Morrison (*Pro Hac Vice*)
imorrison@seyfarth.com
Thomas M. Horan (*Pro Hac Vice*)
thoran@seyfarth.com
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000

312607855v.1

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2024, a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


/s/ Ian H. Morrison

312607855v.1